[No. C041832. Third Dist. Dec. 3, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
RYAN PETER KANAWYER, Defendant and Appellant.

1234

COUNSEL

Jerry D. Whatley, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, John G. McLean and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SIMS, Acting P. J.**—Defendant Ryan Peter Kanawyer went to the home of his grandparents with a sawed-off shotgun, broke in, and shot them at close range, killing them. A jury convicted him of two counts of first degree murder (Pen. Code, § 187, subd. (a); counts 1 & 2) and one count of residential burglary (Pen. Code, § 459; count 3).[1] On each murder count, the jury also found true two special circumstances for imposition of a life sentence without parole: defendant (1) committed multiple murders, and (2) committed murder while engaged in a burglary. (§ 190.2, subds. (a)(3), (a)(17)(G).) The jury further found that defendant personally used a firearm in committing each murder. (§ 12022.53, subd. (d).) Defendant was sentenced to two consecutive terms of life imprisonment without the possibility of parole for the murders, plus consecutive terms of 25 years to life for the firearm enhancements. The burglary term was stayed pursuant to section 654.[2]

Defendant contends on appeal the trial court erred in refusing to give his requested jury instruction on voluntary manslaughter in a heat of passion (§ 192, subd. (a); CALJIC Nos. 8.40, 8.50). The defense heat-of-passion theory was that defendant had endured a long history of criticism, reproach, and ridicule at the hands of his grandparents, principally his grandfather, that provoked him to homicide. However, the evidence indicated defendant had not been in contact with his grandparents for two weeks before he killed them. According to defendant, when he went to his grandparents' house, he

---

[1] Undesignated statutory references are to the Penal Code.

[2] The court also ordered defendant to pay a restitution fine of $10,000 under section 1202.4 and another restitution fine of $10,000, which the court stayed pursuant to section 1202.45. Finally, the court ordered defendant to pay $1,289.99 to the Victims of Violent Crime Program. (§§ 1202.4, 2085.5, subd. (b).)

flew into a rage when he knocked and rang the bell with no response. But he did not encounter his grandparents until he had forced his way in, and there is no evidence that either of them did anything to provoke a reasonable person to kill. The record therefore lacks substantial evidence of sufficient provocation to arouse a homicidal rage or passion in an ordinarily reasonable person, as required to warrant an instruction on voluntary manslaughter in a heat of passion. The court did not err in refusing the requested instruction.

We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The victims, Peter and Marilyn Boyes, were defendant's maternal grandparents.

Defendant's grandfather was retired from the military. He was strict with defendant and had high expectations for him. Defendant's grandfather wanted defendant to go into the military, as did all the males in their family.

When defendant was 10, his father committed suicide. Before then, the family, including the grandparents, was close. After the suicide, defendant's grandfather tried to fill the role of defendant's father, attending baseball games and visiting often. But defendant's grandfather did not like defendant's father and defendant overheard conversations where his grandfather discussed his father.

About a year after defendant's father's death, defendant's mother met a new man who moved in with the family. Defendant's grandfather did not like this man either and thereafter rarely visited. Defendant then started cutting school, his grades dropped, and he quit playing sports.

Defendant's mother died of cancer in 1999, when defendant was 18.

Defendant's sister, Tiffany Kanawyer, testified that there was a history of incidents where defendant's grandparents, principally his grandfather, criticized or ridiculed defendant, in conversation or in letters, causing defendant to react emotionally.

Defendant's sister testified she could recall two instances when defendant's grandfather yelled at him. She witnessed other discussions between defendant's grandfather and defendant where defendant reacted emotionally, but she testified these two incidents "were the more dramatic ones that stick out in [her] mind."

The first incident occurred when defendant was five. Defendant's sister described defendant as "on the puny side" at the time. Defendant was trying to eat something and defendant's grandfather began to ridicule him about his weight. Defendant's sister was mortified.

The second incident took place when defendant's mother was in the hospital. Defendant had a discussion with his grandparents in the hallway outside her room. Defendant's grandparents told him he needed to get a job, quit freeloading, or get out of his mother's house, because she did not need the stress. Defendant said nothing, but walked out of the hospital with tears in his eyes.

Defendant reacted to the death of his mother traumatically, crying uncontrollably and saying, "my mom is dead, my mom is dead, I don't have a mom anymore." Defendant's grandparents attended the funeral but did not console defendant.

Between the time when the new man moved in with defendant's mother and her death, defendant's contact with his grandparents consisted mostly of letters. According to defendant's sister, the tone of the letters was "[v]ery accusatory, very demeaning." The letters said that defendant would turn out to be just like his father, and that defendant needed to get a job and do something with his life. Defendant's grandparents made similar comments to defendant's sister who relayed them to defendant. Upon receiving one such letter from his grandparents just prior to his mother's death, defendant physically began to shake and started crying, threw the letter on the floor, and screamed obscenities, "F them, F them, I'm never gonna be good enough for them." Defendant continued to receive similar letters from his grandparents up until the time of their deaths.

Also, defendant's sister was present when defendant called his grandparents to report that he had gotten a job at Dairy Queen, but they indicated the job was not good enough because it was working part time at minimum wage. Defendant continued to speak normally during the call, but tears were coming from his eyes and he was sobbing.

Defendant and his sister were forced to leave their mother's house after her death. Defendant's sister rented a one-bedroom apartment. Defendant lived with her for nine months, until one month before he killed his grandparents. Defendant's grandparents told his sister she should kick him out if he did not get a job. Around Christmas 2000, she did so, because he was not paying bills, not cleaning the house, and stealing minor things from her.

Nevertheless, defendant's sister felt her grandfather was hard on defendant. Defendant was intimidated by his grandfather. Defendant said he felt that if

he did not do as his grandfather wished, he would wash his hands of defendant. In the times when defendant's sister saw her grandfather criticize defendant or reduce him to tears, she never saw defendant stand up to him, fight back, and yell at him.

After defendant's sister made him move out, defendant stayed in an apartment in Marysville with Eric Newsome. Julie Jarvis lived with Jared Lyman in another apartment in the same complex.

About two weeks before defendant killed his grandparents, Lyman gave defendant a ride to visit them. Defendant's grandparents were going to give him money. Newsome and his cousin went with them; Lyman was driving a car belonging to Newsome's cousin.

Defendant's grandparents lived in Rancho Murieta, a private, gated community. At the gate, defendant gave the security guard a name (that Lyman did not hear), the guard made a telephone call, and they were admitted.[3] They parked in a lot across from defendant's grandparents' house. Defendant asked the others to wait outside and went in his grandparents' house for about a half-hour. Afterwards, defendant bought the others a drink at a local store and some Nyquil for Lyman who had been sick.

Defendant's sister testified she telephoned her grandmother a couple of weeks before her grandparents' death. Defendant was at the house. Defendant had gone there to borrow money, which he had done before. According to defendant's sister, since his mother's death, defendant's grandparents gave defendant money "every other month or so." Defendant's grandparents would loan defendant money, but, at the same time, they were very judgmental and critical of him.

Two weeks later, on January 29, 2001, defendant killed his grandparents. On that day, in the early evening, Jarvis gave defendant, Newsome, and Lyman a ride in her car to Rancho Murieta. Lyman drove. Defendant told Jarvis he wanted to pick up his car, which he had left as collateral for a loan.

Defendant seemed upset to Jarvis that day. He talked about his father killing himself and his mother dying of cancer a few years later. Defendant talked about how he had to take care of himself and his sister and how he felt as if the whole family had disowned him. Defendant looked like he was hurting and in pain.

---

[3] Residents of Rancho Murieta provide their security department a list of visitors that are to be admitted. Residents may also list individuals who are not to be admitted. On December 20, 1999, defendant's grandparents instructed the security department not to admit defendant.

During the drive, defendant told Lyman to say to the guard at the gate that he was Brian Boyes to see Peter Boyes.[4] Lyman was reluctant about this, but did so and they were admitted. They went to defendant's grandparents' house and parked in the lot across the street. Defendant told the others to wait, but Newsome and Lyman were hungry and said they were going to wait at a Taco Bell across the highway. Defendant said he would meet the others in about a half-hour.

Jarvis noticed that defendant had a sawed-off shotgun with him. Jarvis asked defendant why it was in her car and what it was for. He said it was okay and not to worry about it. Jarvis saw defendant walk toward his grandparents' house. She and the others went to Taco Bell. Defendant returned about a half-hour to 45 minutes later, jogging slowly across the highway. Defendant seemed like he was cold because he was "shaky," but otherwise he seemed fine. Defendant and the others went back to the apartment complex in Marysville.

The next day the Boyes's bodies were discovered in their house.

The frame to the kitchen door to the outside was broken. There was a footprint on the door.

Peter Boyes was found on the stairs. A pathologist testified that Peter Boyes was likely shot with a rifle slug from a shotgun, at least twice, first in the arm and then in the face, from a distance of no greater than four feet. Death was instantaneous after the shot to the head.

Marilyn Boyes was lying on the second floor landing, a TV remote control on the ground by her. According to the pathologist, Marilyn Boyes was killed instantaneously by a shot to the head that came from a distance of more than four feet.

The door from the kitchen to the garage was open a few inches. A Jaguar and Lincoln Town Car were parked in the garage. The ignition of the Lincoln was damaged. There was a hammer and screwdriver on the front seat, as well as a purse with its contents spilled out. In the master bedroom, the dresser drawers were open, a jewelry box was open, and pieces of jewelry that appeared to have been dumped out of the jewelry box were on top of the dresser.

---

[4] Security personnel keep a guest registry. An entry on January 29, 2001, showed that Brian, a guest, arrived and was granted access to the Boyes's residence.

Two days later, defendant was arrested and interviewed by a police investigator on videotape.[5]

In the interview, defendant said that on January 29, 2001, he went to his grandparents' house to borrow money to pay the rent. His grandparents had helped him out before. Defendant said he had gone to their house two weeks before, but "just went to see how they were doing."

Defendant explained that he was upset when he decided to visit his grandparents: "Halfway through the day, I flipped my lid. I can't explain why, how, okay. A lot of my friends, you can ask them, they'll tell you, I'm not normal. My head is not on straight. But I don't—I don't know—I said, 'Okay. I'm going to Sac [Rancho Murieta]. That's what I want to do.' "

Defendant also explained the reason for his mental state: "I seen my dad with a fucking .357 hole through his fucking head when I was ten years old. Okay. No—his head was gone. Okay. Ten years old I find my father like this. 18 years old—before I even turned 18, I was 17. My mom's diagnosed with cancer. She gets worse, worse, worse. Turn 18 worse, worse. Right before my 19th birthday she died. Okay. I got to watch her die. That's not what I wanted to grow up seeing. That's not what I came to this fucking world for. Okay. I understand that life's not fair and everything that you have to go through, the trials and tribulations to get you where you want to be in your life. But that's uncalled for. It's unfair. It's not good."

Defendant said he felt stressed and sick that day. He had worked until about 4:00 p.m., and then taken a nap at Newsome's apartment. He had not worked much the previous week and expected to receive only $45 in pay the following day, all of which he had to give Newsome for rent. Defendant said that, when he woke from the nap, he was in a bad mood, "pissed off yelling at everybody."

After the nap, defendant, Newsome, Lyman, and Jarvis drove to Rancho Murieta. The others dropped defendant off at his grandparents'; he told them to wait for him at a gas station, that he would be back in 45 minutes.

Defendant said that he had a sawed-off shotgun stuffed into his pants and up his shirt. Defendant had borrowed the gun and kept it hidden for three weeks. Defendant did not think he would have to use the gun at his

---

[5] Pursuant to the parties' stipulation, a version of the videotape edited to remove extraneous matter was played for the jury and a transcript of the interview was provided to the jury to assist them in understanding and listening to the tape. The tape and the transcript were admitted into evidence.

grandparents', but he had put pressure on himself by saying he could get some money if he got a ride.

Defendant told the investigator that defendant went to his grandparents' house, knocked on the door, and rang the bell. There was no answer, though defendant could hear the television on loud. Defendant said his grandparents were "pretty damn deaf." Defendant walked around the house, trying to see in. He could see his grandfather's head in an upstairs room and defendant knocked on the back door, hoping his grandfather would hear him through the glass door.

Defendant said there was "still no answer. And then I started to get raged and what not, because they weren't hearing me." Defendant explained that he had already "promised my friends gas money for bringing me out there" and "I was broke," and "they weren't hearing me so I forced myself into the house," hitting the side door with his shoulder.

Defendant told the investigator that defendant then encountered his grandfather: "I walked down the hallway. Then I saw my grandfather coming down the steps. [¶] . . . [¶] He was screaming and yelling." Defendant's grandfather was "screaming something. He pointed his finger at [defendant] and said something." Defendant did not know what his grandfather was yelling or saying. Even before his grandfather spoke, defendant was "already mad." Defendant said it looked like his grandfather "was going to slap me or something." Defendant said he thought his grandfather "was just trying to get me out of the house. Tell me to go." Defendant added that his grandfather "didn't let me get a word in edgewise. I mean, he didn't notice that it was me, though, was probably why," because "I had my hat low" and "I had a hood on." Defendant did not say anything; he was "choked up"; he could not believe that he had forced his way into his grandparents' house.

Defendant was standing halfway under a "catwalk" in the stairs. Defendant's grandfather was looking down at defendant from the stairs at an angle. Defendant heard his grandfather tell his grandmother to "call the cops." When he heard that, defendant felt "[s]cared as hell" that the police would catch him. As soon as his grandfather said it, defendant fired on him. His grandfather turned and sat down after the first shot and started to scream. Defendant shot him twice.

Defendant's grandmother asked if his grandfather was all right and came out of the upstairs bedroom. She took two steps out of the doorway and defendant shot her once.

Defendant took his grandfather's wallet out of his back pocket. Defendant tried to "pop the . . . ignition" on the Lincoln Town Car in the garage. Defendant tried to find car keys without success. He took some money out of his grandmother's purse.

Defendant left the house after 44 minutes—he had set his stopwatch at 45 minutes so he would know when to rejoin the others—and ran back through Rancho Murieta. He fell down in the street, dropping the shotgun and leaving it there.

Defendant met the others, who were sitting in the car, waiting for him. Defendant was not sure anyone could tell something had happened, but he was breathing hard from running, so he told them, "I just ran." Defendant gave Lyman $30 for gas and bought cigarettes and a soda.

Defendant did not testify.

At trial, defendant requested a jury instruction on manslaughter in a heat of passion, based on the history of defendant's grandparents' criticism of him, his emotional reaction to it, his need for money from them, and his rage at what he interpreted to be their excluding and ignoring him on the day he killed them. The prosecutor argued that there was no substantial evidence of provocation to warrant the instruction: the evidence consisted only of defendant's sister's testimony regarding two specific incidents of defendant's grandfather yelling at him and that defendant's grandparents gave him money, asking in return that he get a job or go to school.

The trial court acknowledged the authority supporting the theory that provocation can occur over time, but denied the requested instruction, stating that "in this case, however, the period of time is fairly extreme" and "there still is implied in this theory a certain level of immediacy." The court reasoned that "while some acts of Mr. Boyes occurred over a period of time, it doesn't appear that [defendant] was acting under the influence of those at the time he went to the home, as evidenced by his own statement and the observations of others, the long drive, . . . the description of his mood, as well." The court also observed that Peter Boyes's excited reaction to encountering defendant did not constitute provocation that would justify the instruction. As to Marilyn Boyes, the court stated that "there is just not even a scintilla of evidence of provocation on behalf of Mrs. Boyes."

After the jury returned guilty verdicts, defendant moved for a new trial on the ground, inter alia, that he was entitled to a voluntary manslaughter instruction. The court denied the motion.

Defendant appealed.

## DISCUSSION

Defendant contends, "the trial court committed reversible error when it denied appellant's request to have the jury instructed on manslaughter based on heat of passion." (Capitalization omitted.) We find no error.

"It is of course the rule that the court is under no duty to give a requested instruction when there is no substantial evidence in support." (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836], citing *People v. Flannel* (1979) 25 Cal.3d 668, 684–685 [160 Cal.Rptr. 84, 603 P.2d 1] (*Flannel*); see also *People v. Neely* (1993) 6 Cal.4th 877, 897 [26 Cal.Rptr.2d 189, 864 P.2d 460] (*Neely*); *People v. Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149] (*Jackson*), disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 898 [103 Cal.Rptr.2d 23, 15 P.3d 243]; *People v. Franco* (1994) 24 Cal.App.4th 1528, 1539–1540 [30 Cal.Rptr.2d 478] (*Franco*).)[6] " Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*).)

We find no substantial evidence in the record to support defendant's conviction of voluntary manslaughter here, because there was no substantial evidence of "sufficient provocation."

The California Supreme Court in *People v. Steele* (2002) 27 Cal.4th 1230 [120 Cal.Rptr.2d 432, 47 P.3d 225] (*Steele*), explained the elements of voluntary manslaughter in a heat of passion, including sufficient provocation: "Since its adoption in 1872, section 192, subdivision (a), has described voluntary manslaughter as the unlawful killing 'upon a sudden quarrel or heat of passion.' . . . Also since its adoption in 1872, section 188 has stated that

---

[6] While defendant appears to accept this standard in one part of his opening brief, in another part he contends a "requested instruction must be given if the record contains any evidence deserving any consideration whatsoever supporting the instruction." Defendant cites *People v. Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281] (*Carmen*). The Supreme Court in *Flannel, supra,* 25 Cal.3d 668, quoted language in *Carmen* reflecting this principle, but also said: "Many cases cite, often without elaboration, language in *Carmen, supra,* . . . to the effect that jury instructions must be given whenever *any* evidence is presented, no matter how weak. To the extent that a decision of any court interprets these cases to require instructions without evidence substantial enough to merit consideration, it is disapproved." (See *Flannel, supra,* 25 Cal.3d at pp. 684–685, fn. 12.) The Court also said—with regard to the instruction on the now abolished diminished capacity defense at issue in the case (§§ 25, 28)—that " 'where there is "no substantial evidence of diminished capacity" the court does not err in refusing to give instructions based on that defense.' " (*Flannel, supra,* 25 Cal.3d at p. 684.) This rule has since guided review of whether courts have erred in refusing instructions on voluntary manslaughter. (See, e.g., *Neely, supra,* 6 Cal.4th 877, 897; *Franco, supra,* 24 Cal.App.4th 1528, 1539–1540.)

malice is implied 'when no considerable provocation appears.' [Citation.] Under this language, '[e]vidence of adequate provocation overcomes the presumption of malice. [Citation.] Accordingly, for voluntary manslaughter, 'provocation *and* heat of passion must be affirmatively demonstrated.' [Citations.]" (*Steele, supra,* 27 Cal.4th 1230, 1252.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that *the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.'* " (*Steele, supra,* 27 Cal.4th 1230, 1252–1253, italics added; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143–1144 [124 Cal.Rptr.2d 373, 52 P.3d 572] (*Gutierrez*).)

Thus, " '[t]o satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' " (*Gutierrez, supra,* 28 Cal.4th 1083, 1144, citing *People v. Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311] (*Wickersham*), disapproved on another ground in *Barton, supra,* 12 Cal.4th 186, 201.) Furthermore, "[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be *caused by the victim* [citation], or be conduct reasonably believed by the defendant to have been *engaged in by the victim."* (*People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001] (*Lee*), italics added.)

There is an additional objective component to voluntary manslaughter applicable to defendant's requested instruction. "For such an instruction, the killing must be 'upon a sudden quarrel or heat of passion' (§ 192); that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 868 [277 Cal.Rptr. 122, 802 P.2d 906] (*Daniels*) [defendant rendered paraplegic when shot by police officers during bank robbery was not entitled to requested instruction on voluntary manslaughter when he killed two officers coming to arrest him two years three months later]; see also *Wickersham, supra,* 32 Cal.3d 307, 327 ["[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary

manslaughter—'the assailant must act under the smart of that sudden quarrel or heat of passion' "]; *People v. Middleton* (1997) 52 Cal.App.4th 19, 34 [60 Cal.Rptr.2d 366], disapproved on another ground in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752, fn. 3 [3 Cal.Rptr.3d 676, 74 P.3d 771].)

■ In sum, where there is no substantial evidence of sufficient provocation that would arouse a passion in an ordinarily reasonable person or evidence of sufficient time for that passion to subside in a reasonable person, the court need not give a requested instruction on voluntary manslaughter. (Cf. *Steele, supra,* 27 Cal.4th 1230, 1253–1254; *Daniels, supra,* 52 Cal.3d 815, 868.)

To be sure, " 'there is no specific type of provocation required by section 192 and . . . verbal provocation may be sufficient.' [Citation.]" (*Wickersham, supra,* 32 Cal.3d 307, 326, fn. omitted; *Lee, supra,* 20 Cal.4th 47, 59 ["The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].)

■ Also, provocation can arise as a result of a series of events over time, as defendant argues occurred here. (See *People v. Wharton* (1991) 53 Cal.3d 522, 569 [280 Cal.Rptr. 631, 809 P.2d 290] (*Wharton*) ["provocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time"].) However, as the trial court noted, the period involved where courts have found provocation over time is nowhere near as long as the 14- or 15-year period during which defendant, according to his sister, was the target of criticism and ridicule by his grandparents. (See, e.g., *Wharton, supra,* 53 Cal.3d 522, 571 [the "defense theory at trial was that [defendant] killed after enduring provocatory conduct by the victim over a period of weeks"]; *People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777] ["Defendant's testimony chronicles a two-week period of provocatory conduct by his wife Rachel that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from that passion"]; *People v. Borchers* (1958) 50 Cal.2d 321, 323–326, 329 [325 P.2d 97] [referring to unspecified period of "long continued provocatory conduct" by deceased woman that defendant knew less than five months]; *People v. Bridgehouse* (1956) 47 Cal.2d 406, 407 [303 P.2d 1018] [defendant and his wife discussed her relations with deceased man for " 'well over a year' "].)

■ In any event, where the claimed verbal provocation occurred some time before the crime, as here, the Supreme Court has said there is insufficient evidence of provocation as a matter of law to warrant a jury instruction on voluntary manslaughter. (*People v. Pride* (1992) 3 Cal.4th 195, 250 [10

Cal.Rptr.2d 636, 833 P.2d 643] (*Pride*).) In *Pride*, defendant was convicted of killing two women with a knife in the building of the insurance company where they worked. (*Id.* at p. 213.) Defendant was a janitor in the building who three days earlier had been notified by his supervisor of a complaint about the quality of his work. (*Id.* at p. 216.) Defendant had reacted violently, clenching his fists and calling the complaint a " 'fucking lie.' " (*Ibid.*) Defendant threatened to get the person who made the complaint and knew that one of the women he ultimately murdered was partly responsible for monitoring janitorial services. (*Ibid.*) As here, the trial court instructed the jury on first and second degree murder, but denied defendant's request for instruction on voluntary manslaughter, which defendant claimed was warranted by the evidence. (*Id.* at p. 250.)

The court found the record did not support defendant's claim. (*Pride, supra,* 3 Cal.4th 195, 250.) "To the extent defendant relies on criticism he received about his work performance *three days* before the crimes, such evidence is insufficient as a matter of law. . . . And, because the injuries inflicted were consistent with either a provoked or a premeditated killing, we reject defendant's claim that this evidence, when combined with the evidence that defendant's work performance was criticized, justified the requested instructions. On this record, failure to instruct on voluntary manslaughter was not error." (*Ibid.*; see also *People v. Bufarale* (1961) 193 Cal.App.2d 551, 562 [14 Cal.Rptr. 381] ["The provocative factor was [the deceased's] rejection of defendant's continued attentions and her decision to live with her husband; this occurred many days previous to the killing, and, as a matter of law, did not constitute legal cause for the 'heat of passion' which will reduce an unlawful killing from murder to manslaughter"].)

Based on the two weeks intervening between defendant's last contact with his grandparents and their deaths, there is no substantial or legally sufficient evidence in the present record to sustain either of the objective components of voluntary manslaughter: (1) that the provocation be sufficient to arouse passion in an ordinarily reasonable person, and (2) that the time elapsed between the provocation and the killing not be sufficient for passion to subside in a reasonable person. (See *Pride, supra,* 3 Cal.4th 195, 250; *Daniels, supra,* 52 Cal.3d 815, 868.) That is to say, even assuming, without deciding, that defendant was actually acting in a heat of passion "based on years of abuse at the hands of his grandparents," as he theorized at trial, this "abuse," i.e., harsh criticism of defendant's hapless lifestyle, could not be sufficient provocation under the objective standard, because of the significant time separating any opportunity for the claimed provocation to occur from the homicides. (Cf. *Steele, supra,* 27 Cal.4th 1230, 1253.)

Furthermore, there is no evidence in the record that defendant's grandparents criticized or scolded him during that visit two weeks before the murders.

To the contrary, defendant said in the interview that he had gone to see them just to see how they were doing, indicating that the visit was friendly. He did not say anything to suggest that they had criticized or scolded him on that day or that he felt the sting of their criticism two weeks later on the fatal day when he went to their house again.

The record thus lacks substantial evidence of *sufficient* provocation to arouse heat of passion on the day of the murders or *insufficient* time for a heat of passion to subside between the claimed provocation and the murders. Either way, the requested instruction on voluntary manslaughter was not warranted, notwithstanding the history of criticism of defendant by his grandparents.

Moreover, the record indicates that the circumstances that did affect defendant emotionally on the day he killed his grandparents had nothing to do with them. (See *Lee, supra,* 20 Cal.4th 47, 59.) Defendant stated that he "flipped [his] lid" halfway through the day and then decided he wanted to go to see his grandparents. He told the police interviewer he was "not normal" and his head was "not on straight," a mental state he attributed to experiencing his father's suicide and his mother's death at an early age. But he made no mention of his grandparents in connection with these thoughts or feelings. To the extent defendant's youthful experiences have made him emotionally unstable, this mental state is irrelevant to the objective inquiry whether sufficient provocation existed. (See *Steele, supra,* 27 Cal.4th 1230, 1253 ["Defendant's evidence that he was intoxicated, that he suffered various mental deficiencies, that he had a psychological dysfunction due to traumatic experiences in the Vietnam War, and that he just 'snapped' when he heard the helicopter, may have satisfied the subjective element of heat of passion" but "does not satisfy the objective, reasonable person requirement, which requires provocation by the victim"]; see also *In re Thomas C.* (1986) 183 Cal.App.3d 786, 798 [228 Cal.Rptr. 430].)

There is also no substantial evidence in the record of sufficient provocation by defendant's grandparents after defendant arrived at their house on the fatal day. Although he became enraged when they failed to hear him and answer the door, it is obvious that these circumstances are not sufficient to provoke a reasonable person to a homicidal rage. When defendant encountered his grandfather, his grandfather's screaming and pointing in an effort to get an unknown intruder (defendant, whom his grandfather did not recognize because of his hat and hood) to leave the house and calling for his wife to summon the police, is equally insufficient provocation. Indeed, "[n]o case has ever suggested . . . that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*Jackson, supra,* 28 Cal.3d 264, 306 [no error in

refusing voluntary manslaughter instruction based on evidence that defendant became enraged when elderly victim awoke during burglary and began to scream].)

■ We conclude the trial court did not err in refusing defendant's request to instruct the jury on voluntary manslaughter, because "there was no substantial evidence deserving of consideration which might have led reasonable jurors to reach a verdict of voluntary manslaughter."[7] (*Jackson, supra,* 28 Cal.3d 264, 305.)

## DISPOSITION

The judgment is affirmed.

Davis, J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 18, 2004.

---

[7] Because we reach this conclusion, we need not determine whether the trial court's refusal to give the requested instruction constituted harmless or reversible error. (See *Jackson, supra,* 28 Cal.3d 264, 306.)