Filed 1/20/15  P. v. Olivo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FERNANDO OLIVO,<br><br>    Defendant and Appellant. | B253021<br><br>(Los Angeles County<br>Super. Ct. No. KA099931) |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed.

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Fernando Olivo appeals his conviction for second degree murder. Olivo contends that the trial court prejudicially erred by failing to instruct the jury on voluntary manslaughter on a heat-of-passion theory. Discerning no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *The shooting*

Darlin Estrada is appellant Olivo's sister. Estrada had been dating the victim, Randy Bonilla, for approximately three years. During most of that period the couple lived with Bonilla's family. In June 2012, the couple was "having problems" and Estrada moved to her mother's South El Monte apartment. Olivo and other relatives lived there as well. In early October 2012, Estrada and Bonilla's relationship stabilized and Bonilla also began living at the South El Monte apartment.

On October 18, 2012, at approximately 4:30 p.m., Bonilla picked Estrada up from work and drove her to the apartment. He intended to drop her off and continue on to a friend's house. Bonilla pulled his Honda into a carport at the back of the apartment complex. He waited in the car, with the engine running and the driver's side window up but cracked open, while Estrada retrieved her belongings and exited the car. Olivo suddenly approached the Honda's driver's side, and he and Bonilla argued. Estrada left and walked toward the apartment. A minute or two after Estrada walked away, Olivo shot Bonilla four or five times through the driver's side window. Bonilla rapidly pulled out of the carport and onto a nearby street, where he lost control of the Honda and collided with a parked vehicle. One of the bullets penetrated Bonilla's heart and lung. Paramedics arrived and treated him, but his wounds proved fatal.

Deputies searched Bonilla's Honda. No weapons were found inside.

Autopsy results showed Bonilla had both methamphetamine and marijuana in his system. A defense expert testified that Bonilla was under the influence of methamphetamine when he died. Depending on how much is ingested,

2

methamphetamine can cause hyperactivity and agitation, and can cause a user to become hostile and violent.

Olivo fled immediately after firing the shots.

b. *Witness statements and testimony*

While it was undisputed that Olivo shot Bonilla, the key witnesses at trial─Estrada and Olivo─gave varying accounts of what precipitated the shooting.

(i) *Estrada's interview with detectives*

Police conducted an audiotaped interview of Estrada at approximately 11:30 p.m. on the night of the shooting, after Bonilla had died. An hour-long excerpt was played for the jury. During the interview, Estrada was distraught, frightened, and evasive. She told detectives the following. When Bonilla picked her up from work that day, he pushed her. As a result she rode in the back seat of the Honda, where she felt safer. When Bonilla pulled into the carport, he and Estrada talked for four to five minutes, and were "fine." Bonilla said he was going to a friend's for a bit and would be right back. They said they loved each other.

As Estrada was getting her things out of the back seat, Olivo appeared "[o]ut of nowhere." He approached within three to five feet of the driver's side window. Olivo said to Bonilla, " 'What's your problem, dog?' " and " 'You want to be calling my sister a bitch? I'll show you a bitch, step outside the car.' " Bonilla denied calling Estrada a bitch. Olivo replied that he had heard Bonilla do so. Bonilla said, " 'Come on, Fernie.' . . . 'I already told you . . . let it be between me and your sister. Don't get involved.' " Olivo replied, " 'You've said it too many times in front of me,' " or " '[t]his [has] . . . happened too many times.' " During the argument, each man "threatened" the other. At some point during the argument, Bonilla said to Olivo, " 'What the fuck bitch,' " which in Estrada's view implied that Olivo was "not a man." Bonilla never exited the Honda, but when Olivo first approached, Bonilla came "up to the window" as if to say, " 'what-you-gonna-do?' "

3

Estrada told Olivo to ease off, leave Bonilla alone, and not "start anything." Olivo replied, " 'Just be quiet, fool. I'm not gonna do anything.' " Estrada admonished, " 'keep it calm, keep it clean, please.' " She walked away, assuming they were going to engage in a fistfight. At that point they were quiet and not arguing. Then she heard Bonilla say, "No, dog, no, dog, no, no, no, dog, no," the same words he had used when confronted with a person brandishing a gun in a previous, unrelated road rage incident. As Estrada walked away, she heard gunshots, which she assumed were fireworks. She did not see her brother shoot Bonilla.

When asked by detectives whether Bonilla and Olivo had argued that morning, Estrada replied that she had not seen them argue before she left for work at 6:45 a.m.

On prior occasions, Bonilla had hit or pushed Estrada while they were driving in the car. Bonilla had threatened both Estrada and Olivo "plenty of times" before October 18, 2012. Olivo had previously told Bonilla, " 'Please do not disrespect my sister in front of me, okay?' " Olivo had also told Estrada not to "bring [her] relationship problems around me. I don't like the way he talks to you. I don't like the way he treats you." Estrada had asked Bonilla not to "talk down" to her or call her names in front of her family, but he "never learned." Bonilla had been using methamphetamine the week before the shooting. When he was high he became obnoxious and said obnoxious things.

(ii) *Estrada's trial testimony*

At trial, Estrada testified that she and Bonilla had been arguing during the days preceding the shooting. On the morning of the shooting, Bonilla declined to wake up and drive her to work, so Olivo offered her a ride instead. As they were preparing to leave, Bonilla came downstairs yelling and cussing. Estrada ignored him. En route to the hospital where Estrada worked, Olivo pointed out that Bonilla was following them. Bonilla was driving erratically and tailgating Olivo's car. As Bonilla passed, he made hand gestures, and "flip[ed them] off."

When Olivo and Estrada arrived at her workplace, Bonilla was waiting for them. He approached their car and "started arguing," "blurting out all kinds of stuff." He threatened to shoot and kill Olivo, and "didn't care who was around."

4

Olivo drove away. Bonilla continued to "harass" Estrada, who called her supervisor. Bonilla then threatened Estrada and her family and "shov[ed] [Estrada] around."[1] He pushed her and spat at her. He was rude and accusatory and kept "putting [Estrada] down." Estrada called Olivo and alerted him to the threats.

When her work day concluded, Estrada walked toward a local park. She had planned to call Olivo for a ride, but before she did so, she encountered Bonilla, who gave her a ride instead. She was no longer worried about the threats he had made that morning. Estrada believed that Bonilla was jealous and thought she was going to the park to meet men. He grabbed her, pulled her hair, and spit on her. They argued in the car, but had largely resolved their differences by the time they reached the apartment.

Olivo approached the driver's side of the car. He said to Bonilla, "What's your problem, dog?" Olivo "confronted" Bonilla and "ask[ed] him" about calling Estrada "a bitch, a slut and stuff like that" in front of him and "everybody else in the house." Olivo said, "You want to be calling my sister a bitch? I'll show you a bitch. Step outside the car." Bonilla responded by stating he did not want any problems, but his body language indicated he wanted to fight. Estrada also testified that "at first Randy did get crazy. He did get loud through the window." Bonilla said, "What do you want to do about it?" Bonilla partially opened the door. He pushed his chest out and put his hands up. Bonilla then shut the car door. Estrada admonished the men to keep calm and clean, and walked away. Based on the comments from both men, she believed they were going to fight, but it "wasn't a big deal." As she was leaving, it was apparent the men were arguing, but their conversation was not loud.

When Bonilla was using drugs he was short tempered, and "wasn't himself." He would become violent and spit at her, pull her hair, and push her. Bonilla had never given her a black eye or broken any bones. She did not tell Olivo that Bonilla had pulled her hair or spat at her on the date of the shooting, and she had no visible injuries.

---

[1] Estrada's testimony was contradictory regarding which threats were made while Olivo was present.

(iii) *Olivo's trial testimony*

Olivo testified that he shot Bonilla in self-defense. His account of the incident was as follows. The morning of the shooting, Estrada asked him for a ride to her job at the hospital. As they were preparing to leave, Bonilla came downstairs and cussed at Olivo. Bonilla asked, "What the fuck are you doing? Why are you taking her to work? She should have woke[n] me up." Bonilla called Olivo a "bitch" and told him to stay out of his and Estrada's "fucking business." Olivo responded that Estrada had tried to wake Bonilla up, but Bonilla had continued sleeping. Olivo did not respond to Bonilla's cussing with unkind words. Instead, he told Bonilla "whatever" and ignored him. Olivo "pretty much walked away from" Bonilla. He simply wanted to get Estrada to work and "get this over with."

As Olivo was driving Estrada to work, Bonilla followed. Bonilla flashed his lights at Olivo, tailgated his vehicle, flipped him off, tried to go around him, and hung out the window, saying things Olivo could not hear. Olivo "didn't pay no mind to it." He did not respond to Bonilla's actions but simply continued driving regularly.

When they arrived at the hospital, Bonilla approached Olivo's vehicle and opened the back door to Olivo's car "all crazy." Bonilla appeared "mad, upset, agitated" and was cussing. He reiterated that Estrada should have taken the bus when she was unable to wake him. He also told Olivo to "stay out of his fucking business; it's their fucking relationship. That I'm always getting involved into their business." Bonilla said that Olivo "would get hurt" if he did not stay out of Bonilla's business. Olivo replied that "if it involves my sister, it involves me." Olivo told Bonilla to "chill out." Olivo "just remained calm because [he] didn't want to make a scene" at Estrada's workplace. Olivo drove away.

When Olivo had driven two blocks from the hospital, Estrada called, in tears, and told him to be careful. Bonilla had said that "he was going to get a gun and shoot [Olivo], and [Bonilla] didn't care if [Olivo's] mother was there." At that point Olivo felt "mad, scared, pretty much trying to protect my family." He felt threatened and panicked. He explained Bonilla had "never acted out this violently towards us or me, so this time I

6

was taking it pretty serious." Olivo obtained a loaded gun from an acquaintance in order to protect his family.

Olivo then returned to the apartment, where he spent the morning. He picked up his girlfriend from work. Then he went to the home of a friend who lived "three houses down" from the apartment, and they "h[u]ng out" in the front yard. Olivo brought the gun with him. When the prosecutor asked how he was "feeling" about "the whole Randy situation" and whether he was still afraid at that point, Olivo testified that he "was still worried about it."

While in the friend's yard Olivo saw Bonilla's car pass by. Olivo "kind of figured he was up to no good." Bonilla pulled into the apartment complex and parked. Olivo drove his car back to the complex and parked. He walked up to Bonilla's car, where he heard Estrada and Bonilla arguing. He knocked on the car window asked Bonilla "why did he keep disrespecting my sister, and why was he threatening my life and my family's life." Olivo stated, "Why don't you get out of the car. You want to do something, you know, we could do it." Olivo complained that Bonilla had been calling Estrada a bitch. Olivo wanted Bonilla to exit the car so he could be sure Bonilla did not have access to a weapon and they could "handle it out, talk about it." Bonilla "had the window down a little bit, so he was kind of like yelling, like getting crazy with" Olivo, telling him he should not get involved in his and Estrada's relationship. Estrada exited the car and headed toward the apartment. Olivo and Bonilla continued to "hav[e] words," "[p]retty much just like battling words, like I wanted him to get [out of] the car so we could . . . see if he wanted to fight me or not." Bonilla "threaten[ed] his hands up at" Olivo and pushed out his chest, which Olivo took as a challenge. Olivo felt "disrespected."

Suddenly Bonilla put the Honda in reverse, and then drove forward. Olivo moved to the middle of the driveway. The car sped right towards Olivo, so Olivo backed up and fired when the car was approximately three feet away from him. He pulled the gun when he thought the car was going to hit him. He did not point the gun at Bonilla. He explained he shot "[b]ecause I was in danger, I felt my life [was] in danger." He thought Bonilla was trying to run him over.

7

When asked "What was your state of mind, what were you thinking when you went over to Randy's car?" Olivo testified: "Talked to him about what was happening, how come he had threatened me, you know, what's going on." When asked, "What made you decide to shoot?" Olivo reiterated, "I felt my life was in danger. I thought he would hit me with the car."

After the shooting Olivo threw the gun in a dumpster and went "on the run," although he planned to turn himself in to police eventually.

2. *Procedure*

Trial was by jury. Olivo was convicted of the second degree murder of Bonilla.[2] (Pen. Code, § 187, subd. (a).)[3] The jury also found that Olivo personally and intentionally used and discharged a firearm, causing Bonilla's death. (§ 12022.53, subds. (b), (c), (d).) Olivo admitted serving two prior prison terms within the meaning of section 667.5, subdivision (b). The trial court denied Olivo's motion to reduce the verdict to manslaughter, and sentenced him to 42 years to life in prison. It ordered Olivo to pay victim restitution and imposed a restitution fine, a suspended parole restitution fine, a court operations assessment, and a criminal conviction assessment. Olivo appeals.

## DISCUSSION

*The trial court did not err by failing to instruct on voluntary manslaughter on a heat-of-passion theory.*

The trial court instructed the jury on first degree murder, second degree murder, self-defense and defense of another, and voluntary manslaughter based on imperfect self-defense. Defense counsel requested that the trial court also instruct on voluntary manslaughter based on sudden quarrel or heat of passion. The court declined to do so. It concluded there was insufficient evidence of provocation by the victim, and Estrada had

---

[2]     The jury acquitted Olivo of first degree murder.

[3]     All further undesignated statutory references are to the Penal Code.

8

testified he shot in self-defense, not in the heat of passion. Olivo contends this was prejudicial error.

a. *Applicable legal principles*

A trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) Instructions on a lesser included offense must be given when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense, but not the greater. (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Manriquez* (2005) 37 Cal.4th 547, 584.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) The existence of any evidence, no matter how weak, will not justify instruction on a lesser included offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68; *People v. Wyatt* (2012) 55 Cal.4th 694, 698.) In deciding whether substantial evidence exists, we do not evaluate the credibility of the witnesses, a task for the jury. (*Wyatt,* at p. 698; *Manriquez*, at p. 585.) Substantial evidence to support an instruction may exist even in the face of inconsistencies presented by the defense itself. (*Millbrook*, at p. 1137.) The duty to instruct on lesser included offenses is not satisfied by instructing on only one theory of an offense if other theories are supported by the evidence. (*People v. Lee* (1999) 20 Cal.4th 47, 61.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113; *People v. Booker* (2011) 51 Cal.4th 141, 181.) Doubts about the sufficiency of the evidence to warrant an instruction should be resolved in the defendant's favor. (*People v. Moye, supra,* 47 Cal.4th at p. 562; *People v. Tufunga* (1999) 21 Cal.4th 935, 944.) When considering whether lesser included instructions should have been given, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook, supra,* 222 Cal.App.4th at p. 1137; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.)

9

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser offense of murder. (§ 192, subd. (a); *People v. Moye, supra*, 47 Cal.4th at p. 549; *People v. Benavides, supra*, 35 Cal.4th at p. 102; *People v. Lee, supra,* 20 Cal.4th at p. 59.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*People v. Beltran* (2013) 56 Cal.4th 935, 942, 951; *People v. Manriquez, supra,* 37 Cal.4th at p. 583.)

"Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Beltran, supra,* 56 Cal.4th at p. 942; *People v. Enraca* (2012) 53 Cal.4th 735, 759; *People v. Moye, supra,* 47 Cal.4th at p. 550.) " ' "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." ' " (*People v. Souza, supra,* 54 Cal.4th at p. 116; *People v. Lee, supra,* 20 Cal.4th at p. 59.)

A heat-of-passion theory of manslaughter thus has both an objective and a subjective component. (*People v. Moye, supra,* 47 Cal.4th at p. 549; *People v. Manriquez, supra,* 37 Cal.4th at p. 584.) "The provocation which incites the defendant to homicidal conduct . . . must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee*, *supra,* 20 Cal.4th at p. 59; *Manriquez*, at p. 583.) The victim's conduct may have been physical or verbal, but it must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People v. Beltran, supra,* 56 Cal.4th at p. 939; *People v. Enraca, supra,* 53 Cal.4th at p. 759; *Lee*, at p. 59.) Provocation can arise as a result of a series of events over time. (*People v.*

10

*Wharton* (1991) 53 Cal.3d 522, 569; *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245; CALCRIM No. 570.)

To satisfy the subjective component, the defendant must have killed "while under 'the actual influence of a strong passion' induced by [adequate] provocation." (*People v. Moye, supra,* 47 Cal.4th at p. 550.) If sufficient time has elapsed for the defendant's passions to cool and his or her judgment to be restored, malice is not negated. (*People v. Beltran, supra,* 56 Cal.4th at p. 951; *People v. Millbrook, supra,* 222 Cal.App.4th at p. 1139.) " ' "[N]o specific type of provocation [is] required," ' " and "the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] other than revenge [citation]." (*People v. Breverman, supra,* 19 Cal.4th at p. 163; *Beltran,* at p. 950; *Millbrook,* at p. 1139.)

b. *Application here.*

Because there was not substantial evidence that Olivo actually acted in the heat of passion provoked by the victim, the trial court did not err by refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion.

First, it is questionable whether sufficient evidence of legally adequate provocation existed. Estrada testified that Bonilla sometimes pushed her, pulled her hair, and spit on her, but there was no evidence Olivo was aware of these actions. Estrada admittedly did not tell him Bonilla had engaged in this abuse on the date of the shooting. Olivo did not testify that he had observed such conduct, nor did he specifically complain about such conduct when he confronted Bonilla in the carport.[4] There was evidence that

---

[4]     Olivo points out that "[t]here was a restraining order in place to prevent Bonilla from harassing" Estrada at her workplace. The nature of this "order" was not clear from the evidence presented at trial. The only evidence in the record came from Estrada, who briefly testified that Bonilla "wasn't allowed to be around my work . . . because my supervisor actually put, kind of, like a restraining thing against him at work." There was no evidence regarding the basis for, or nature of, the "order." Without additional evidence regarding the nature and basis for the "order," and Olivo's knowledge of the basis for it, Estrada's testimony on this point did not provide evidence supporting a heat of passion instruction.

11

Bonilla had repeatedly called Estrada a "bitch," a "slut," and similar names in front of Olivo. In general, however, the use of verbal epithets does not constitute legally sufficient provocation. (See *People v. Manriquez, supra,* 37 Cal.4th at pp. 585-586 [being called a " 'mother fucker' " insufficient evidence of provocation]; *People v. Najera* (2006) 138 Cal.App.4th 212, 216, 226 [being called a " 'faggot' " would "not drive any ordinary person to act rashly or without due deliberation"].) Olivo's general statements that he did not like how Bonilla treated or talked to Estrada were too nonspecific to demonstrate provocation. That Bonilla was a methamphetamine user who became "obnoxious" when under the influence had relevance to the question of whether Olivo believed he needed to act in self-defense, but does not appear germane to prove provocation.

Estrada and Olivo both testified that at approximately 6:45 that morning, Bonilla cussed at them, followed and tailgated Olivo's car, made rude gestures, and threatened to shoot them. However, the shooting occurred hours later, near 5:00 p.m., after Olivo had ample time to cool off. (See *People v. Beltran, supra,* 56 Cal.4th at p. 951; *People v. Moye, supra,* 47 Cal.4th at p. 551 [physical fight that occurred the prior evening did not constitute legally sufficient provocation for killing the next morning].) Olivo's testimony about his activities for the remainder of the day did not suggest otherwise. Similarly, although Estrada testified that Bonilla had made unspecified threats to her and Olivo in the past, such threats were too remote to amount to provocation for the shooting.

While the evidence regarding exactly what transpired in the carport discussion was conflicting, the best case scenario for the defense was that both men made unspecified threats; unspecified "battling words" passed between them; and Bonilla spoke loudly or yelled through the rolled-up car window, told Olivo not to interfere in his relationship with Estrada, pushed out his chest in a confrontational manner, and called Olivo a "bitch," all of which caused Olivo to feel "disrespected." The victim did not initiate the argument that culminated in the shooting; instead Olivo, armed with a gun, initiated the carport encounter and challenged Bonilla to get out of the car and fight. Furthermore, "[t]o be adequate, the provocation must be one that would cause an emotion so intense

12

that an ordinary person would simply *react,* without reflection." (*People v. Beltran*, *supra,* 56 Cal.4th at p. 949.) Bonilla's statements in the carport—a denial that he had mistreated Estrada, and an admonition to Olivo to stop interfering—were not of an ilk to cause "an emotion so intense that an ordinary person would simply *react*" with "his reason and judgment obscured." (*Ibid.*; see *People v. Gutierrez* (2009) 45 Cal.4th 789, 826-827 [fact defendant engaged in a verbal argument with the victim, who cussed at him and scratched him during a tussle, did not demonstrate legally sufficient provocation; "a voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words"]; *People v. Manriquez, supra,* 37 Cal.4th at pp. 585-586 [victim taunted defendant, called him a " 'mother fucker,' " and stated that if he had a weapon he should take it out and use it; such statements "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739-740 [that victim smirked, looked at defendant " 'real dirty, like he wanted to fight or something,' " yelled out names, and glared in an intimidating way could not be deemed enough to provoke a reasonable person].)

While none of the foregoing circumstances, considered separately, was sufficient evidence of provocation, the question remains whether, viewed cumulatively, they did. Olivo urges that Bonilla's "continual abusive and violent treatment of . . . Estrada" was the "long-simmering provocation that precipitated the quarrel" between Olivo and Bonilla. Olivo also analogizes the instant matter to *People v. Barton, supra,* 12 Cal.4th 186. There, the defendant was convicted of voluntary manslaughter. He argued on appeal that the trial court had erred by giving a heat-of-passion instruction over his objection. Our Supreme Court rejected Barton's argument that the record contained insufficient evidence to prove heat of passion or sudden quarrel. (*Id.* at pp. 201-202.) The court explained: "The record contains substantial evidence, some of it offered by the prosecution and some by the defense, from which the jury could reasonably find that defendant intentionally killed Sanchez in a sudden quarrel or heat of passion. Defendant testified that shortly before the killing of Sanchez, his daughter Andrea had come to him,

extremely upset, and told him that [Sanchez] . . . had threatened her with serious injury by trying to run her car off the road, and that he had spat on the window of her car. When defendant and his daughter confronted Sanchez about his conduct, Sanchez called defendant's daughter a 'bitch' and he acted as if he was 'berserk.'  Defendant and Sanchez angrily confronted each other and Sanchez assumed a 'fighting stance,' challenging defendant.  After defendant asked his daughter to call the police, Sanchez started to get into his car; when defendant asked Sanchez where he was going, Sanchez replied, 'none of your fucking business,' and taunted defendant by saying, 'Do you think you can keep me here?'  Screaming and swearing, defendant, before firing, ordered Sanchez to 'drop the knife' and to get out of his car, threatening to shoot if Sanchez did not do so.  This testimony provided substantial evidence from which a reasonable jury could conclude that when defendant killed Sanchez, defendant's reason was obscured by passion to such an extent as would cause an ordinarily reasonable person to act rashly and without reflection, and that defendant thus shot Sanchez in a sudden quarrel or heat of passion." (*Id.* at p. 202.)

*Barton* is similar to the instant case in several respects.  Both cases involved confrontation of a person perceived to have mistreated the defendant's relative, and both involved the use of epithets and a "road rage" incident.  (See also *People v. Millbrook, supra,* 222 Cal.App.4th at p. 1142 [finding *Barton* analogous where "testimony was presented that a person close to the defendant was threatened or disrespected, the defendant and the victim argued, and the defendant felt threatened when he shot the victim"].)  There are significant differences as well:  the "road rage" incident in *Barton* immediately preceded and precipitated the shooting, whereas here hours had elapsed; and the argument in *Barton* was more heated and prolonged than the relatively brief, and less furious, carport argument here.

But assuming arguendo that there was sufficient evidence under *Barton* to support a finding of legally sufficient provocation, we believe there was insufficient evidence to show that Olivo's emotions were so inflamed that he *actually* killed the victim in a heat of passion.  (See *People v. Moye, supra,* 47 Cal.4th at p. 550.)  If Olivo's testimony was

14

credited, unlike in *Barton* he reacted calmly to Bonilla's behavior the morning of the killing: he did not respond in anger to Bonilla's cussing at the apartment and largely ignored him; he did not respond to Bonilla's aggressive behavior on the freeway, but continued driving normally. He obtained the gun because he was afraid Bonilla would act on his threats, not because he was angry at him. He shot at Bonilla because he believed Bonilla was about to run him down with his car. Thus, his testimony did not suggest, explicitly or implicitly, that he shot because he was enraged. When asked at trial about his state of mind in the carport, Olivo did not state that he was blinded by passion or anger. To the contrary, he testified that he intended to talk to Bonilla about the threats and "what's going on." Thus, based on his own testimony, Olivo did not shoot because he was acting under the influence of a strong passion. (See *Moye*, at pp. 553-555 [where defendant testified that he killed the victim in self defense, and no other evidence demonstrated his state of mind, no reasonable juror could conclude he killed in the heat of passion].)

Olivo's testimony would not preclude a heat of passion instruction if there was other direct or circumstantial evidence that he was actually acting in the heat of passion when he shot. (See *People v. Barton, supra,* 12 Cal.4th at p. 202; *People v. Elize* (1999) 71 Cal.App.4th 605, 612.) But such evidence is lacking here. "[C]ase law and the relevant jury instructions make clear the extreme intensity of the heat of passion required to reduce a murder to manslaughter." (*People v. Beltran, supra,* 56 Cal.4th at p. 950.) Estrada's description of Olivo's demeanor did not suggest he was enraged. Olivo approached the car and sought to talk to the victim about his treatment of Estrada and his threats. This evidence is more consistent with a calculated decision by Olivo to challenge Bonilla than with a sudden quarrel. "One does not act rashly . . . simply by acting imprudently or out of anger. Even imprudent conduct done while angry is ordinarily the product of some judgment and thought, however fleeting. This is not the type of truly reactive conduct contemplated . . . ." (*Ibid.*) During the argument, Olivo had the presence of mind to try to get Bonilla to step out of the car to ensure he was unarmed. In short, "[t]here was no showing that defendant exhibited anger, fury, or rage; thus, there

15

was no evidence that defendant 'actually, subjectively, kill[ed] under the heat of passion.' " (*People v. Manriquez, supra,* 37 Cal.4th at p. 585.) Because there was an absence of evidence that Olivo's actions were actually motivated by an anger or passion so strong that his judgment was eclipsed and his reason was obscured (*Beltran*, at pp. 949-950), the trial court did not err by declining the requested heat of passion instruction.[5]

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KITCHING, Acting P. J.

KUSSMAN, J.[*]

---

[5] In light of our conclusion, we need not reach the issue of prejudice.

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16