Filed 7/30/14  P. v. Chavez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HECTOR REFUGIO CHAVEZ,<br><br>    Defendant and Appellant. | F066359<br><br>(Kern Super. Ct. No. BF138555A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Hector Refugio Chavez shot and seriously wounded Jorge Bravo.  After a jury trial, defendant was convicted as charged of count I, attempted

premeditated murder (Pen. Code, §§ 664, 187, 189),[1] with enhancements for personally and intentionally discharging a firearm (§ 12022.53, subd. (d)) and inflicting great bodily injury (§ 12022.7); count II, assault with a firearm (§ 245, subd. (b)), with enhancements for personal use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury; count III, felon in possession of a firearm (§ 12021, subd. (a)(1)); and count IV, active participation in a criminal street gang (§ 186.22, subd. (a)), with an enhancement for personal use of a firearm. The jury found the gang enhancements true for counts I, II, and III (§ 186.22, subd. (b)).

The court found defendant had one prior serious felony conviction (§ 667, subd. (a)); one prior strike conviction, and served one prior prison term (§ 667.5, subd. (b)).

Defendant was sentenced for count I, attempted premeditated murder, to 15 years to life doubled to 30 years to life as the second strike term, with consecutive terms of 25 years to life for the section 12022.53, subdivision (d) firearm allegation, three years for the great bodily injury enhancement, and five years for the prior serious felony enhancement, for an aggregate term of 55 years to life plus eight years. The court imposed and stayed the other terms and enhancements.

On appeal, defendant contends there is insufficient evidence to support the gang enhancements; the court had a sua sponte duty to instruct on attempted voluntary manslaughter as a lesser included offense to count I; the term imposed for the great bodily injury enhancement must be stricken; the court imposed a restitution fine in violation of the prohibition against ex post facto laws; and the amount of conduct credits must be corrected in the abstract of judgment.

We will stay the term imposed for the great bodily injury enhancement, correct the conduct credits, and otherwise affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

## FACTS

Around 11:23 p.m. on March 15, 2011, Bakersfield Police officer Jerry Whisenhunt responded to a shooting which occurred in an alley near Niles Street in Bakersfield. He found 16-year-old Jorge Bravo seated in a wheelchair, with several people standing around him. Bravo had suffered multiple gunshot wounds to his stomach and leg. The investigating officers found four shell casings in the alley consistent with ammunition from a .40-caliber semiautomatic pistol. There were two shell casings in one location, and two more casings in another location, indicating the gunman had moved around in the alley as he fired.

Officer Ryan Kroeker testified that Calvin Stepney contacted him the day after the shooting and said that he had seen the incident. Stepney said he saw three Hispanic males walking in the area, and one man carried a gun. Stepney said he briefly spoke with the men because he feared he was going to be shot. The men ignored him, they kept walking, and they approached the victim. Stepney said the gunman fired the weapon toward the victim. Stepney told Kroeker he recognized some of the men and knew where one of them lived, but he did not know their names.

Officer Kroeker investigated Stepney's information about the possible suspects and compiled a series of photographs. Based on the photographs, Stepney identified defendant Hector Refugio Chavez, William Bocardo, and Richard Gonzalez as the three men who walked into the alley.[2] William Bocardo was defendant's brother, and Gonzalez was the boyfriend of defendant's niece.

---

[2] At trial, Stepney testified he saw three Hispanic males walk into the alley; he never saw anyone with a gun; he did not see the shooting; and he only heard the gunshots. Stepney admitted he contacted Officer Kroeker and identified the suspects from photographs. Also at trial, Stepney testified defendant did not look like one of the men who walked into the alley on the night of the shooting.

3.

**Bravo's statements in the hospital**

On March 16, 2011, Officer Kroeker interviewed Bravo in the hospital, and showed him separate photographic lineups which contained pictures of defendant, Bocardo, and Gonzalez. Bravo identified defendant as one of the men in the alley. He did not identify Bocardo or anyone else in another lineup. In the third lineup, Bravo thought Gonzalez looked familiar, but he was not sure.

Bravo told Kroeker that three men approached him in the alley, and defendant asked where he was from. Bravo told them he was not a gang member. Defendant pulled a gun and tried to fire it twice, but the gun did not go off. Bravo said "the next thing he knew shots were being fired," and he fell to the ground. Bravo did not tell Kroeker that he had been in a fight with defendant a few days earlier.

On March 18, 2011, Officer Heredia conducted another interview with Bravo in the hospital. Bravo said he was walking in the alley with his girlfriend, Sylvia Villareal, when three Hispanic males approached him. Bravo said he did not know them. One man asked Bravo where he was from. Bravo said he did not have time to respond because the same man pulled a gun. The gunman was about three to five feet away from Bravo. He aimed the weapon at Bravo's chest and pulled the trigger. The gun did not fire. The gunman again pulled the trigger, and the gun again failed to discharge.

Bravo said he started to back away from the gunman. Bravo said the gunman turned to his accomplices and asked, " 'What should I do?' " The gunman pulled the trigger again. This time the gun discharged, and the gunman fired multiple shots into Bravo's body. The gunman was about five feet away from Bravo when the gun finally discharged.

Bravo said the gunman's weapon was similar to Officer Heredia's .40-caliber Glock semiautomatic firearm. Bravo denied being a gang member, but said he was afraid.

4.

**Bravo's initial trial testimony**

At trial, Bravo, who was 18 years old, was called as a prosecution witness. Bravo was in shackles and two armed bailiffs were next to him. Bravo testified he was a ward of the juvenile court and living at Camp Erwin Owen because he had stopped going to school.[3] Bravo said he did not want to testify in this case.

Bravo testified he did not remember anything about the shooting; he did not know what happened; he never walked in the alley; and he refused to answer most of the prosecutor's questions. Bravo admitted he was at a friend's house with Sylvia Villareal just before he went to the hospital. Bravo testified he woke up in a hospital. He had gunshot wounds and required surgery on his arm, leg, chest, and lung. He was in the hospital for a month. Bravo said he never talked to any officers, looked at photographs, or identified anyone when he was in the hospital.

Bravo testified he was a member of the Loma Bakers and admitted it was a criminal street gang associated with the Sureño prison gang. He had been a gang member for "a while" before the shooting. A lot of kids in his neighborhood were also members of the Loma Bakers. Bravo testified members of the Loma Bakers carry guns because of problems with rival members of the Colonia and Okie gangs, even though they were also Sureño gangs, and that members of rival Sureño gangs get into altercations with each other.

**Bravo's second trial appearance**

After Bravo's initial appearance, the prosecution called Officers Heredia and Kroeker, and Calvin Stepney as trial witnesses. Later that afternoon, Bravo returned to the witness stand and indicated he had reconsidered his previous testimony. Bravo explained he did not want to "get [defendant] locked up" when he testified earlier. Bravo

---

[3] Bravo later explained that he stopped going to school to avoid people who were trying to knife him.

explained he changed his mind and he was willing to testify: He wanted to "put him away … because he might do it again."[4]

Bravo identified defendant as the gunman. Bravo testified he had seen defendant two days before the shooting. Bravo was at "Mona's" house with his friend, Anthony. Defendant showed up with his own friends. Bravo did not know defendant's name. Defendant and his friends caused problems, and started fighting with Bravo and his friend. Defendant claimed he was a tough guy, and Bravo and his friend were punks. Bravo's friend beat up defendant, punched him in the face, and gave him a bloody lip.

Bravo testified that on the night of the shooting, he was again at Mona's house with Sylvia Villareal. Bravo and Villareal left Mona's house and walked through the alley. As Bravo and Villareal reached the end of the alley, he heard people yell something at him. Defendant and two other men walked up to Bravo. Defendant asked for a cigarette. Bravo said he did not have a cigarette. Bravo testified the men did not ask where he was from.

Bravo testified defendant pulled a gun from his waistband, and tried to fire it at him twice. The gun did not discharge. Defendant asked his companions, " 'What do we do now?' " Defendant again pulled the trigger and the gun went off. Bravo testified defendant fired eight shots into his body. Bravo was wounded in the arm, leg and chest, and he was "on the verge of dying."

Bravo testified that while he was still in the hospital, he spoke to officers and looked at photographs. Bravo identified defendant as the gunman and recognized him from the prior altercation at Mona's house. Bravo did not know the two men who were with defendant during the shooting. Bravo admitted that he had not told the police that

---

[4] Bravo testified no one made any promises in exchange for his decision to testify against defendant. Bravo was scheduled to be released from Camp Erwin Owen the day after his trial appearance, but testified he already knew about that before he decided to resume his testimony.

6.

he and his friend fought with defendant a few days before the shooting, or that defendant suffered a bloody lip from the fight.

In contrast to his earlier testimony, Bravo testified he was not a member of the Loma Bakers, but he associated with members because he lived in their territory. Bravo testified no one asked him where he was from before the shooting, and the shooting had nothing to do with gangs. Bravo believed defendant shot him because "he got mad that he got beat up by young kids" during the earlier incident at Mona's house.

## GANG EVIDENCE

### Stipulations

The parties reached the following stipulations regarding the gang evidence. The Sureños are a criminal street gang as defined in section 186.22, subdivision (f), they are an ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in section 186.22, subdivision (e), having a common sign or symbol, and whose members, individually or collectively, engage in or have engaged in a pattern of criminal gang activity.

The parties also stipulated the Sureño gang engaged in a "pattern of criminal gang activity" as defined in section 186.22, subdivision (e), which is the commission of, attempted commission of, or solicitation of, sustained juvenile petitions for or conviction of two or more of a number of enumerated offenses, consistent with the statutory definition.

As relevant to the elements of count III, felon in possession of a firearm; count IV, active participation in a criminal street; and the gang enhancements alleged as to counts I and III, the parties further stipulated defendant had a prior felony conviction for assault with a deadly weapon other than a firearm with a gang enhancement in Kern County in 2006.

7.

**Gang expert**

Officer Eric Littlefield, the prosecution's gang expert, testified Bravo was shot in an area controlled by the Loma Bakers. Drug sales and other illegal activities occur "almost around the clock" in that area, particularly in the alley.

Littlefield testified to his opinion that defendant, Gonzales, and Bocardo were active members of the Sureño gang. Littlefield explained the Sureños were part of the larger Mexican Mafia, and there were numerous small Sureño gangs in Bakersfield and other communities.

Littlefield testified about a series of gang-related incidents involving the three men. In 2006, Gonzalez and defendant were ejected from a nightclub. Gonzalez and several subjects threatened the bouncers, waived blue bandanas, and shouted gang-related slogans, including " 'We back the blue,' " referring to the Sureños. Defendant and Gonzalez were arrested, and both admitted association with "the Southside," which also referred to the Sureños.

In 2010, officers contacted defendant and Bocardo. Both of them had gang-related tattoos. Defendant admitted he was a member of the Southside Pomona, and Bocardo admitted his association with the gang.

Defendant had been booked into custody nine times. He claimed "South" and the subset of "Pomona" and asked to be kept away from the North or Northerners. Defendant had been ordered by the court to register as a gang member as a provision of his prior conviction of a felony with a gang enhancement.

**Hypothetical question**

Officer Littlefield was asked a hypothetical question similar to the facts of this case – a prior altercation occurred between young and older members of Sureño gangs, the older member was beaten by a younger member, the older gang member and two other active members confronted one of the younger members in an alley near Niles

8.

Street and tried to shoot him, the gun misfired, and he ultimately shot the younger victim multiple times. Littlefield testified to his opinion:

> "[S]tarting with the initial fight, should a gang member lose a fight, in particular, an older member with a younger person, and *in particular, if the person is not a gang member*, they lose face within their peers group, for the most part. That losing face is a loss of status, as well, and can bring a number of consequences for gang members, including ostracization where they're shunned by the peers as being perceived as weak or cowardice, and they can be – they could ultimately be the victim of a homicide, should they not retaliate.

> "So the fight, in and of itself, the older person losing to a younger potentially not gang member is highly significant to me.

> "The fact that the second altercation took place [on Niles Street] … [that] was one of my favorite areas to work looking for gang members and gang activity in that area. It's … fairly plagued with gang activity in the area.

> " … The fact … that the person who ultimately ends up shooting is accompanied by two other members and the fact that each of those two members are either members or associates of the criminal street gang, in my opinion, supports that – that loss of face for losing a fight. Should … a gang member indicate they lose a fight in order to regain that respect, in order for them to keep their reputation, if you will, at the level that it was at prior to or even bolster it, they're expected to retaliate violently, and often times we see that that violence is seen in the way of shootings."

Officer Littlefield testified the gang member's possession of the gun was a common practice in the gang culture, and would have been for the benefit of the gang since the gun was "a tool of the trade" to commit robberies, assaults, drug offenses, homicides, and other crimes against rivals and targets of opportunity, and protect fellow gang members and their livelihoods. Littlefield testified the shooting was committed for the benefit of and in association with a criminal street gang; he could not offer an opinion whether the shooting was committed at the direction of a criminal street gang without evidence about the gunman's contacts with other gang associates.

9.

**DEFENSE EVIDENCE**

Defendant did not testify at trial. He called several friends and relatives who testified that on the evening of March 15, 2011, they attended a weekly Bible study at the home of Robert and Elena Bocardo. Robert was the brother of defendant and his alleged accomplice, William Bocardo. Defendant lived with Robert and his wife. Robert knew defendant and William were involved with the Southside Pomona gang when they lived in Los Angles, but testified they were no longer involved with the gang when the family moved to Bakersfield. Robert conceded he did not know that defendant had been convicted of a gang-related offense in Bakersfield in 2006.

Robert and the attendees at the Bible study testified they saw defendant and his girlfriend at the house that night. Defendant and his girlfriend did not attend the Bible study. They rented a movie and watched it in another room, and they were still in that room when the other guests left between 9:00 p.m. and 9:30 p.m. Robert and his wife went to bed between 11:00 p.m. and 11:30 p.m., and they never saw defendant leave the residence.

Corina Vorse, defendant's girlfriend, testified they rented movies and watched them at Robert Bocardo's house all evening. Vorse testified they fell asleep together in bed by 11:00 p.m.

**DISCUSSION**

## I. Substantial evidence to support the gang findings

The jury found true the gang enhancements alleged as to count I, attempted premeditated murder, count II, assault with a firearm, and count III, felon in possession of a firearm. Defendant contends the gang enhancements must be stricken because there is insufficient evidence that he harbored the specific intent to promote, further, or assist in any criminal conduct by gang members when he armed himself and attempted to murder Bravo.

10.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).)

### A. The specific intent element

There are two elements required to establish the gang enhancement. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) The prosecution must prove the felony was committed for the benefit of, at the direction of, or in association with any criminal street gang. (§ 186.22, subd. (b)(1).) Defendant has not challenged the sufficiency of the evidence to support this element, and concedes Officer Littlefield's expert testimony raised the inference that the shooting was gang-related.

As for the second element, the prosecution must prove the defendant committed the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at pp. 64–65.) Defendant contends there is insufficient evidence of the specific intent element because there was no gang aspect to the shooting, the evidence showed defendant acted alone, and there is no evidence Bocardo or Gonzalez said or did anything to encourage him.

The specific intent element of the gang enhancement is established by evidence the defendant "personally committed a gang-related felony with the specific intent to aid

11.

members of that gang." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322.)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) In *Albillar*, there was "ample evidence" that the defendants intended to attack the victim; they assisted each other in raping her; and they were each members of a criminal street gang, so that there was substantial evidence of the specific intent element. (*Ibid*.)

### B. Analysis

In this case, there is substantial evidence to support the specific intent element of the gang enhancements for counts I, II, and III. Officer Littlefield testified defendant, Bocardo, and Gonzalez were members of the Sureño gang. Bravo testified he was a member of the Loma Bakers, another Sureño subset, although he later tried to back away from that claim. However, Bravo admitted that he and his friends were in a conflict with defendant a few days before the shooting. They exchanged words about Bravo and his friends being younger than defendant, and Bravo's friend beat defendant and cut his lip. The incident occurred at Mona's house, which was near the Niles Street alley and in the territory of the Loma Bakers. Officer Littlefield testified that a gang member would lose face among his peers if he lost a fight to a younger person, regardless of whether the younger person was also a gang member, and the incident would be perceived as a disrespectful act.

On the night of the shooting, Stepney saw defendant and his two gang associates. One of them had a gun, and Stepney was concerned they were going to shoot him.

12.

Defendant and his associates ignored Stepney and headed into the alley. They confronted Bravo; defendant asked where he was from, and defendant immediately tried to shoot him at point-blank range but the gun did not discharge. There is no evidence whether the gun malfunctioned or defendant simply failed to apply sufficient pressure to the trigger.

Defendant insists there is no evidence the other two gang members did anything to assist or encourage the shooting. When defendant's gun did not fire, however, defendant's first response was to ask his two associates about what to do next. Bravo told the police that defendant asked them: " 'What should I do?' " At trial, Bravo testified defendant asked his associates, " 'What do we do now?' "

Defendant's question raised the reasonable inference that defendant and his associates had discussed what they were going to do that night, i.e., confront and shoot Bravo as he left Mona's house, the same place where Bravo's friend had beaten defendant. Defendant kept trying to fire the gun and it finally discharged before his associates could respond to his question. There is thus substantial evidence to support the specific intent element of the gang enhancement.

## II. <u>Failure to instruct on attempted voluntary manslaughter</u>

In count I, defendant was charged and convicted of the attempted premeditated murder of Bravo. He contends the court had a sua sponte duty to instruct on attempted voluntary manslaughter as a lesser included offense to count I, based on a heat of passion theory given the evidence that he was seeking revenge for the incident where Bravo's friend beat him up.

### A. *Sua sponte duty to instruct*

"A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citation.] This sua sponte obligation extends to lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a

conviction of such a lesser offense. [Citations.]' [Citation.]" (*People v. Lopez* (1998) 19 Cal.4th 282, 287–288.)

The court has a sua sponte duty to instruct on a lesser included offense even if it is inconsistent with the accused's theory of the case, and the defendant expressly objects to the instruction as a matter of trial tactics. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1345; *People v. Breverman* (1998) 19 Cal.4th 142, 154–155.)

However, when the evidence is minimal and insubstantial, there is no duty to instruct. (*People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5.) "[T]he existence of '*any* evidence, no matter how weak'' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could ... conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162, italics in original.)

On appeal, we independently review the question of whether the court failed to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215 (*Cole*).)

### B. *Attempted voluntary manslaughter*

Voluntary manslaughter is a lesser included offense of murder. (*People v. Rios* (2000) 23 Cal.4th 450, 461.) Similarly, a charge of attempted murder includes by implication a lesser charge of attempted voluntary manslaughter. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708–709.)

A lesser included instruction on voluntary manslaughter may be based on "the unlawful killing of a human being without malice aforethought 'upon a sudden quarrel or heat of passion.' [Citation.]" (*Cole*, *supra*, 33 Cal.4th at p. 1215.) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or

disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton*, *supra*, 12 Cal.4th at pp. 201–202.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253.)

"[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) "Although the provocative conduct may be verbal,… such provocation 'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 585–586.)

In addition, "the killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, *and not belatedly as*

*revenge or punishment.* Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' [Citation.]" (*People v. Daniels* (1991) 52 Cal.3d 815, 868, italics added.)

"In sum, where there is no substantial evidence of sufficient provocation that would arouse a passion in an ordinarily reasonable person or evidence of sufficient time for that passion to subside in a reasonable person, the court need not give a requested instruction on voluntary manslaughter. [Citations.]" (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245.)

## C. Analysis

Defendant did not testify at trial, and offered an alibi defense based on the evidence presented by his family and friends – that he was at his brother's house watching movies the entire evening and never left. Defendant never introduced any evidence of his alleged state of mind or any provocation by Bravo. "Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense. [Citation.]" (*People v. Gutierrez, supra*, 112 Cal.App.4th at p. 709.)

In any event, Bravo provided some evidence about the possible motive for the shooting. Bravo testified he saw defendant two days before the shooting when he was at Mona's house with his friend. Defendant arrived with his own friends, and Bravo did not know who they were. Defendant and his friends caused problems, and started fighting with Bravo and his friend. Defendant claimed he was a tough guy, and defendant and his friend were punks. Bravo testified his friend beat up defendant, punched him in the face, and gave him a bloody lip.

Defendant relies on this evidence to support a heat of passion theory of attempted voluntary manslaughter. "When relying on heat of passion as a partial defense to the crime of *attempted* murder, both provocation and heat of passion must be demonstrated. [Citation.]" (*People v. Gutierrez, supra*, 112 Cal.App.4th at p. 709, italics in original.)

16.

There is no evidence of either provocation or heat of passion which would have triggered the court's sua sponte duty to instruct. The conflict at Mona's house occurred two days before the shooting in the alley. There is no evidence that Bravo and/or his friend taunted or threatened defendant after the fight ended that day, or that they saw defendant after the fight and taunted or threatened him afterwards. There is no evidence Bravo engaged in such conduct in the alley in the brief moment before defendant tried to shoot him.

Defendant asserts there was substantial evidence of heat of passion based on the following characterization of the incident: A few days after the fight at Mona's house, defendant "encounter[ed] Bravo in an alley and immediately [shot] him. It is reasonable to infer that [his] otherwise rash and inexplicable action was motivated by the earlier beating, and was done in a heat of passion." Defendant's characterization is refuted by the undisputed evidence about the shooting. Defendant and his two gang associates appeared to be on a mission that night when Stepney saw them heading into the alley with the gun. Stepney was frightened that he was going to be shot, tried to talk to them, and they ignored him and continued into the alley, apparently focused on their goal. The record suggests they may have been heading to Mona's house, which was near the Niles Street area. Instead, Bravo walked into them in the alley, defendant asked where he was from, and then he immediately tried to shoot him at point-blank range. Defendant was only deterred by his inability to discharge the weapon. He briefly asked his associates what he should do, indicating that they had already discussed their intentions. Defendant kept trying until he successfully fired multiple rounds into defendant's body.

As explained *ante*, a killing upon a sudden quarrel or heat of passion must occur " 'suddenly as a response to the provocation, *and not belatedly as revenge or punishment*….' " (*People v. Daniels, supra,* 52 Cal.3d at p. 868, italics added.) In this case, the shooting in the alley occurred two days after the fight at Mona's house, and there is no evidence of any further conflicts or confrontations between Bravo and defendant which would have amounted to continued provocation. Defendant's actions

17.

were completely inconsistent with a sudden decision to shoot Bravo simply upon seeing him. The court did not have a sua sponte duty to instruct on attempted voluntary manslaughter as a lesser included offense to attempted premeditated murder.

### III. <u>Imposition of great bodily injury enhancement</u>

At the sentencing hearing, defendant was sentenced for count I, attempted premeditated murder, to 15 years to life doubled to 30 years to life as the second strike term, plus consecutive terms of 25 years to life for the personal and intentional discharge of a firearm (§ 12022.53, subd. (d)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and five years for the prior serious felony enhancement, for an aggregate term of 55 years to life plus eight years.

Defendant contends, and the People concede, that the court improperly imposed consecutive terms for both the section 12022.53, subdivision (d) firearm allegation, and the section 12022.7, subdivision (a) great bodily injury enhancement. Their agreement on this point is based on section 12022.53, subdivision (f), which states:

> "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section. *An enhancement for great bodily injury as defined in Section 12022.7*, 12022.8, or 12022.9 *shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d).*" (Italics added.)

The parties disagree on the resolution of this sentencing issue. Defendant contends the section 12022.7 great bodily injury enhancement cannot be imposed and must be stricken, while the People assert the imposed term should be stayed.

The People's argument is based on California Rules of Court, rule 4.447, which states:

*"No finding of an enhancement may be stricken or dismissed because imposition of the term either is prohibited by law or exceeds limitations on the imposition of multiple enhancements.* The sentencing judge must impose sentence for the aggregate term of imprisonment computed without reference to those prohibitions and limitations, *and must thereupon stay execution of so much of the term as is prohibited or exceeds the applicable limit.* The stay will become permanent on the defendant's service of the portion of the sentence not stayed." (Italics added.)

"Ordinarily, an enhancement must be either imposed or stricken 'in furtherance of justice' under Penal Code section 1385. [Citations.] The trial court has no authority to stay an enhancement, rather than strike it – not, at least, when the only basis for doing either is its own discretionary sense of justice. [Citations.] [¶] But rule 4.447 has nothing to do with a *discretionary* stay of an enhancement. It is limited to the situation in which an enhancement that *otherwise* would have to be either imposed or stricken is barred by an overriding statutory prohibition. In that situation – and that situation only – the trial court can and should stay the enhancement. [Citations.] [¶] A stay under rule 4.447 is not issued under Penal Code section 654." (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364–365, italics in original.) Rule 4.447 is intended " 'to avoid violating a statutory prohibition or exceeding a statutory limitation, while preserving the possibility of imposition of the stayed portion should a reversal on appeal reduce the unstayed portion of the sentence. [Citation.]' [Citation.]" (*People v. Lopez*, *supra*, at p. 364; *People v. Brewer* (2014) 225 Cal.App.4th 98, 104.)

In *People v. Gonzalez* (2008) 43 Cal.4th 1118 (*Gonzalez*), the defendant was convicted of attempted premeditated murder, and the jury found true the section 12022.5 firearm enhancement, and firearm enhancements pursuant to section 12022.53, subdivision (b), (c), and (d). *Gonzalez* dealt with a situation similar to the sentencing in this case: Multiple enhancements were found true but section 12022.53, subdivision (f) only permitted one to be imposed. (*Gonzalez* at pp. 1122–1123.)

*Gonzalez* addressed what to do when the trial court imposes punishment for the section 12022.53 firearm enhancement with the longest term of imprisonment, and

19.

whether the remaining section 12022.53 firearm enhancements and any section 12022.5 firearm enhancements should be stayed or stricken. (*Gonzalez, supra,* 43 Cal.4th at p. 1122.) *Gonzalez* concluded the trial court should not strike the additional enhancements, but should impose and stay the terms. (*Id.* at pp. 1122–1123.) This interpretation was based on the court's understanding of the purpose behind section 12022.53:

> "[I]t becomes apparent that section 12022.53 was enacted to ensure that defendants who use a gun remain in prison for the longest time possible and that the Legislature intended the trial court to stay, rather than strike, prohibited enhancements under section 12022.53. [S]taying rather than striking the prohibited firearm enhancements serves the legislative goals of section 12022.53 by making the prohibited enhancements *readily* available should the section 12022.53 enhancement with the longest term be found invalid on appeal and by making 'the trial court's intention clear – it is staying part of the sentence only because it thinks it must. If, on the other hand, the trial court were to strike or dismiss the prohibited portion of the sentence, it might be misunderstood as exercising its discretionary power under Penal Code section 1385.' [Citation.]" (*Gonzalez, supra,* 43 Cal.4th at p. 1129, italics in original.)

We agree with the People that the three-year section 12022.7 great bodily injury enhancement must be stayed and not stricken, pursuant to rule 4.447 and section 12022.53, subdivision (f), as interpreted by *Gonzalez* and *Lopez*. As a result, defendant's aggregate term for count I must be reduced to 55 years to life plus five years.

## IV. Imposition of the restitution fine

Defendant asserts the restitution fine and corresponding parole revocation fine must be reduced from $240 to $200. He contends the court imposed the $240 fine because it mistakenly believed it was the statutory minimum amount, based on the newly-enacted version of section 1202.4 which was not applicable to defendant's case.

### A. Background

On March 15, 2011, defendant shot and wounded Bravo. In September 2012, defendant was tried and convicted of committing four felony offenses.

20.

On December 13, 2012, the court conducted the sentencing hearing. In addition to the term of imprisonment, the court followed the recommendation of the probation report and imposed a $240 restitution fine pursuant to section 1202.4, subdivision (b), and imposed and suspended a $240 parole revocation fine pursuant to section 1202.45. The court did not comment when it imposed the fines, defendant did not object, and the probation report did not address which version of section 1202.4 was being relied upon.

**B.  Analysis**

At the time that defendant committed the offenses in March 2011, former section 1202.4, subdivision (b)(1) provided:

> "(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.  [¶]  (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony...."  (Stats. 2011, ch. 45, § 1.)

Effective January 1, 2012, the calculation of restitution fines in section 1202.4, subdivision (b)(1) was amended as follows:

> "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, [but] shall not be less than *two hundred forty dollars ($240)* starting on January 1, 2012...." (Stats. 2011, ch. 358, § 1, italics added.)

Based on this amendment, defendant posits the court imposed the $240 restitution fine by erroneously relying on the amended version of section 1202.4, subdivision (b)(1), which was not applicable to crimes committed before January 1, 2012. Defendant asserts the court's reliance on the newly-enacted version of the statute violates the prohibition against ex post facto law contained in the federal and state Constitutions.

"A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws. [Citations.]" (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30–31.)

21.

Defendant did not object to the court's imposition of the restitution fine or raise his ex post facto argument below. The rule of forfeiture is applicable to ex post facto claims, particularly where the alleged error could easily have been corrected if the issue had been raised at the sentencing hearing. (*People v. White* (1997) 55 Cal.App.4th 914, 917; *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1207.)

In any event, the trial court imposed a restitution fine in this case that was well within the range of fines authorized at the time of the defendant's commission of the March 2011 shooting. There is nothing in the record to support defendant's supposition that the court relied on the subsequent version of section 1202.4, subdivision (b)(1) when it imposed the $240 restitution fine. The court merely imposed the fine without comment. Since the restitution fine was in an amount authorized by the statute that was in effect at the time of defendant's commission of the offense, and there is nothing in the record indicating that the trial court imposed the fine pursuant to the amended version of the statute, defendant's ex post facto claim fails.

## V.    **Correction of abstract of judgment**

Defendant states, and the People agree, the abstract of judgment contains a clerical error regarding his custody credits.

At the sentencing hearing, the court awarded defendant 638 days of actual credits plus 95 days of conduct credits for a total of 733 days.

The abstract of judgment erroneously states that defendant received 634 days of actual credits. The abstract correctly states that he also received 95 days of conduct credits for a total of 733 days.

The abstract of judgment must be corrected to state that defendant received 638 days of actual credits.

## DISPOSITION

The abstract of judgment shall be modified as to count I, attempted premeditated murder, to stay the consecutive three-year term imposed for the section 12022.7 great

22.

bodily injury enhancement.  Defendant's aggregate sentence for count I is reduced to 55 years to life plus five years.

The abstract of judgment shall also be corrected to state that defendant received 638 days of actual credits and 95 days of conduct credits for a total of 733 days.

The superior court is further directed to transmit certified copies of the amended abstract to all appropriate parties and entities.  In all other respects, the judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Peña, J.

23.