Filed 11/15/24  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ARTURO VEGA LOPEZ,<br><br>Defendant and Appellant. | F085981<br><br>(Stanislaus Super. Ct. No. CR21-000749)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[No Change in Judgment] |

**THE COURT:**

It is ordered that the unpublished opinion filed on October 21, 2024, be modified as follows:

1.  On page 2, the second sentence in the first paragraph beginning "A jury convicted," the words "attempted, premeditated, and deliberate murder" are replaced with "attempted murder committed with premeditation and deliberation" so the sentence reads:

> A jury convicted defendant of attempted murder committed with premeditation and deliberation and other charges.

2.  On page 2, in the first sentence of the second paragraph beginning "The District Attorney," the words "first degree attempted murder" are replaced with "attempted murder and the additional allegation that defendant acted intentionally, deliberately, and with premeditation" so the beginning of the sentence reads:

> The District Attorney of Stanislaus County filed an amended information on July 5, 2022, charging defendant with attempted murder and the

additional allegation that defendant acted intentionally, deliberately, and with premeditation ….

3.  On page 2, in the first sentence of the second paragraph, after "(Pen. Code,[1] §§ 664, 187, subd. (a), 189, subd. (a); count I)" add as footnote 2 the following footnote, which will require renumbering of all subsequent footnotes:

> [2] Section 664, subdivision (a) provides for an alternate penalty of life imprisonment with the possibility of parole where the crime attempted is "willful, deliberate, and premeditated murder, as defined in Section 189." (§ 664, subd. (a); see *People v. Favor* (2012) 54 Cal.4th 868, 877 [" '[T]he provision in section 664, subdivision (a), imposing a greater punishment for an attempt to commit a murder that is "willful, deliberate, and premeditated" does not create a greater degree of attempted murder but, rather, constitutes a penalty provision that prescribes an increase in punishment (a greater base term) for the offense of attempted murder.' "].)

4.  At the end of the last paragraph on page 4, in the last sentence after the word "Honda," add as footnote 4 the following footnote, which will require renumbering of all subsequent footnotes:

> [4] Brandon testified that defendant drove a different vehicle during the incident three weeks earlier.  Dominique testified she had not seen defendant driving this vehicle previously, although she had observed defendant driving many other cars.

5.  On page 8, heading I is deleted and the following heading inserted in its place:

> **I.    *Defendant's attempted murder conviction and the jury's true finding that defendant acted with deliberation and premeditation is supported by sufficient evidence.***

6.  On page 8, first sentence of the third paragraph, the quotation " 'A "willful, deliberate, and premeditated killing" is murder in the first degree.  (§ 189.)" is deleted and the following sentence is inserted in its place:

> Defendant argues that insufficient evidence supports the jury's finding that he acted with willfulness, deliberation, and premeditation.

7.  On page 8, second sentence in paragraph three (immediately following the last modification), add a quotation mark (") before " 'Deliberation' refers to careful …."

8.  On page 9, at the end of the first full paragraph, insert "; see §§ 664, subd. (a), 189" after "*Brooks, supra*, 3 Cal.5th at p. 58" so the citations read:

> (*Brooks, supra*, 3 Cal.5th at p. 58; see §§ 664, subd. (a), 189.)

9.  On page 9, the first sentence in the paragraph under subheading "**B. Analysis**" beginning "The facts and circumstances" is deleted and the following sentence is inserted in its place:

> The facts and circumstances here provide substantial evidence to support the jury's verdict of attempted murder and its finding that defendant acted willfully, deliberately, and with premeditation.

10.  On page 10, the third sentence beginning "Defendant rented a car" is deleted and the following sentence is inserted in its place:

> Although defendant worked at his family's tow business with access to numerous cars and had been driving a different car three weeks previously, defendant rented a car and then drove to the meeting with a concealed firearm.

11.  On page 13, the first sentence of the first paragraph following subheading "**C. Analysis**" and beginning "CALCRIM No. 601 sufficiently" is deleted and the following sentences are inserted in its place:

> CALCRIM No. 601 sufficiently instructed the jury with the correct applicable legal principles governing an allegation that defendant acted with premeditation, deliberation, and willfulness.  (See § 664, subd. (a).) Section 664, subdivision (a) provides that these terms have the same meaning as the elements of first degree murder (§189).  (§ 664, subd. (a).)

12.  On page 13, the last sentence of the last paragraph beginning "Consequently, rather than" is deleted and the following sentence is inserted in its place:

> Consequently, rather than remove the element of reflection required for a finding that defendant acted with premeditation, the instruction specifically requires that the jury find defendant guilty only if it finds defendant reflected on and considered his actions before killing.

13. On page 14, the first full paragraph, in the last sentence beginning "Thus again," the words "the defendant guilty" are deleted and the words "the allegation true" are inserted so the sentence reads:

> Thus again, for the jury to find the allegation true, it must first find defendant carefully weighed the consequences of his actions; in other words, it must find defendant first reflected on his decision to kill.

14. On page 15, in the last sentence of the first paragraph, the words "of attempted premeditated murder" are deleted and the words "for an allegation that defendant acted with willfulness, deliberation, and premeditation" are inserted so the sentence reads:

> Thus, taken as a whole, CALCRIM No. 601 comports with the legal requirements for an allegation that defendant acted with willfulness, deliberation, and premeditation, and it fairly and fully instructed the jury on the applicable law.

15. On page 15, in the first sentence of the third paragraph beginning "Defendant's focus," the words "crime is one of" are deleted and the words "allegation is" are inserted so the sentence reads:

> Defendant's focus on CALCRIM No. 601's definition of premeditation, without reading it with the concomitant definition of deliberation, overlooks the fact the allegation is deliberate and premeditated attempted murder.

16. On page 15, the last paragraph, the citation beginning "See *People v. Favor*" is deleted and the following citation is inserted:

> (See *People v. Favor, supra*, 54 Cal.4th at p. 877, quoting *People v. Lee* (2003) 31 Cal.4th 613, 616 ["the premeditation penalty provision of section 664[, subdivision ](a) 'must be interpreted to require … the murder attempted was willful, deliberate, and premeditated' "].)

4.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

HILL, P. J.

WE CONCUR:

LEVY, J.

POOCHIGIAN, J.

Filed 10/21/24  P. v. Lopez CA5 (unmodified opinion)

## <u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARTURO VEGA LOPEZ,<br><br>    Defendant and Appellant. | F085981<br><br>(Super. Ct. No. CR21-000749)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Arturo Vega Lopez shot Brandon F. in the chest, but Brandon survived with minor injuries. A jury convicted defendant of attempted, premeditated, and deliberate murder and other charges. Defendant argues (1) the jury's conviction is not supported by sufficient evidence that he had the intent to kill nor that he deliberated and premeditated prior to shooting Brandon and (2) the trial court erred in defining premeditation in the jury instructions and in failing to instruct on the lesser included offense of voluntary manslaughter. We affirm the judgment.

## PROCEDURAL BACKGROUND

The District Attorney of Stanislaus County filed an amended information on July 5, 2022, charging defendant with first degree attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a), 189, subd. (a); count I), assault with a firearm (§ 245, subd. (a)(2); count II), possession of a firearm by a felon (§ 29800, subd. (a)(1); count III), and possession of ammunition by a felon (§ 30305, subd. (a)(1); count IV). The amended information also alleged that defendant personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) as to count I, personally inflicted great bodily injury (§ 12022.7, subd. (a)) as to count II, had a prior serious felony conviction (§ 667, subd. (a)) as to counts I and II, and had one prior "strike" conviction within the meaning of the "Three Strikes" law (currently codified at §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) as to counts I–IV. Defendant pleaded not guilty and denied the allegations. Defendant waived his right to counsel.

After a six-day trial, a jury convicted defendant of all counts and found true the firearm and great bodily injury enhancements on August 16, 2022. After defendant waived his right to a jury trial regarding the prior strike conviction allegations, the trial court held a bifurcated court trial and found true the allegations.

---

[1] Undesignated statutory references are to the Penal Code.

The trial court denied defendant's motions for new trial and to dismiss his prior strike[2] conviction and enhancements (except for the serious felony conviction under § 667, subd. (a)) and sentenced defendant to a total term of 39 years to life as follows: life with a minimum parole eligibility of 14 years (§§ 187, subd. (a), 664, 667, subd. (e)), plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) as to count I; and stayed (§ 654) terms of nine years, four years, and four years as to counts II, III, and IV, respectively. The court also ordered defendant to pay victim restitution (§ 1202.4, subd. (f)), a $300 restitution fine (§ 1202.4, subd. (b)), a suspended $300 parole revocation restitution fine (§ 1202.45), $120 in criminal conviction assessments (Gov. Code, § 70373), and $160 in court operations assessments (§ 1465.8).

Defendant filed a timely notice of appeal on March 20, 2023.

## FACTS

Defendant's family owned a tow business, and Brandon worked for defendant as a mechanic for a little more than a year. Defendant usually paid cash for Brandon's work, but defendant did not always pay Brandon immediately.

Approximately three weeks before the shooting, defendant and Brandon fought. Defendant called Brandon a "punk," and Brandon responded with a challenge to get down on his knees to "box" with defendant, who was in a wheelchair. Defendant agreed and threw something at Brandon as he dropped to his knees. Brandon punched defendant but left when neighbors yelled at him. After walking a few blocks, defendant drove up to Brandon, apologized, and offered to drive Brandon home. Since Brandon had always gotten along with defendant, Brandon thanked defendant and got into the car. But then defendant started "talking shit," and Brandon asked defendant, "Is this why you gave me the ride?" Defendant continued "talking shit" to Brandon and started speeding through

---

[2]    See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

3.

town at 50 miles per hour. Defendant told Brandon that he wanted Brandon to feel as scared as defendant had felt during their fight.

Brandon asked defendant to let Brandon out of the car when he noticed that defendant was driving toward defendant's tow business rather than taking Brandon home. Brandon was concerned because he was by himself, and defendant's family was at the tow business. Brandon asked defendant several times to let Brandon out of the car because he was worried. Defendant started running stop signs, and when he slowed down to turn a corner, Brandon jumped from the moving car. When Brandon hit the ground, he landed on a drink bottle in his pocket and broke three ribs. Brandon paid an individual to drive him home where Dominique M., his fiancé, bandaged his ribs. Brandon was in pain and had trouble breathing.

On February 1, 2021, approximately three weeks after the fight, defendant contacted Dominique to talk to Brandon because Brandon did not often answer his phone. Brandon spoke with defendant and agreed to meet later that day at defendant's tow business to receive money that defendant owed Brandon. Dominique agreed to drive Brandon to the meeting. Brandon changed the meeting location because he was not on good terms with defendant after the fight and the meeting felt "off." Dominique suggested changing the location to the corner a few blocks away because she also had a bad feeling due to defendant's earlier fight with Brandon.

Defendant called and texted a few times after the first telephone call to confirm that Brandon still intended to meet. Brandon and Dominique drove to the corner near a bottling plant at approximately 5:00 p.m., parked, and waited for defendant to arrive. Defendant arrived and parked behind Brandon and Dominique on the other side of the road, approximately 30 feet away. Defendant was driving a newer Honda and called Brandon to indicate defendant had arrived.

Brandon cautiously walked up to defendant's passenger car door (because he was suspicious of defendant's intentions), rested his arms on the windowsill, and leaned into the open window to greet defendant. Brandon estimated that his body from the shoulders up was inside the window at that time. Defendant was alone, had money in his hands, and asked Brandon how he had been doing. Within 10 seconds, Brandon heard a bang that shattered his eardrum and knocked him back out of the window. Dominique heard the bang as well, recognized it as a gunshot, and then heard Brandon screaming as he backed away from the car holding his chest. Brandon felt a kick but did not know immediately what happened until he looked down and saw a smoke ring coming off his chest. Brandon put his finger into a hole in his shirt, discovered he was bleeding from the right side of his chest, and, based upon knowledge of firearms and the bang, concluded that he had been hit by a .40-caliber bullet.

Brandon yelled, "Fuck, man, this mother fucker shot me," and asked Dominique to take him to the hospital. Brandon tried to see if defendant intended to shoot him again but observed that defendant appeared disoriented from the gunshot. Dominique rammed her car into defendant's car to prevent him from shooting again. Defendant drove off toward his family's tow business, and Dominique followed him for half a block before driving back to Brandon. After Dominique came back, Brandon got into the car and used his phone to find the nearest hospital. Dominique called 911 and told the operator her boyfriend had been shot and she was taking him to the hospital. She had to use Brandon's phone because Brandon had taken her phone to meet with defendant and did not have it when he returned to the car. Dominique identified a photograph of the phone later found in defendant's tow yard as her own.

They arrived at the hospital approximately 10 minutes later, and medical personnel ascertained that the bullet had entered and exited Brandon's chest. Brandon believed he would have taken a bullet to the head if he had not been nodding when defendant shot at

5.

him.  Since being injured, Brandon has experienced swelling on the left side of his body, including his legs, and has difficulty lifting his right arm, or any weight over 20 pounds, without stretching.

After defendant left the scene of the shooting, he called 911 and reported that individuals had rammed his car with their truck (which he later described as an SUV) and then drove off.  Defendant told the dispatcher that he did not know the individuals who had hit him, but later admitted the vehicle appeared to be that of someone he knew, and that he had the license plate which had remained on his car after being hit.  He told the dispatcher that three Hispanic men hit his car, but he did not know them and suggested that they may have intended to rob him.  When asked where he was calling from, defendant responded that he was trying to fix his car, had "walked a little," and provided an address near his tow business.

An officer responded to defendant's 911 call and met with defendant at approximately 5:10 p.m. at the tow business.  Defendant told the officer that he had left his business and was going to the store when an individual tried to flag him down.  The individual tried to assault him, and another individual in the van rammed his vehicle and drove off.  Defendant told the officer that two individuals were involved, described the individual that tried to assault him, but never claimed that he knew either of the individuals.

At some point, the officer learned that Brandon had been shot and defendant was a suspect.  The officer located the vehicle defendant had been driving and determined that it was registered to a rental company and equipped with handicap controls.  When searching the vehicle, officers located a small gun lockbox under the front seat.  They also found a bullet hole and brass located three or four inches below the top of the door panel.  The brass was a piece of casing from a fired bullet.  When they removed the interior door panel, a bullet fell out.  The casing was located in the back seat.  This is

consistent with a right-handed individual firing a gun toward the passenger side of the vehicle. The officer testified that the bullet which hit Brandon could have ended up inside the door panel if the individual was leaning inside the car when shot.

Defendant's trunk was open at the time of the search, and officers found a license plate inside. When searching the area near the car, officers found Dominique's light blue cell phone that had been thrown underneath a car adjacent to the rental vehicle. Defendant told the officer that the individual who flagged defendant as he was driving to the store approached him and was located at both the passenger and driver sides of the car during the encounter.

Brandon's doctor testified that Brandon suffered two subcutaneous bullet wounds that entered and exited the right side of his chest but did not result in damage to any vital organs. The doctor treated Brandon by irrigating the wounds to clean out the metallic residue from the bullet and placing a dressing to cover them. It is common for individuals to suffer muscle or nerve pains or spasms in the region of their gunshot wound. The doctor also saw evidence that defendant's ribs were healing from an earlier fracture.

A crime scene analyst technician took samples from defendant's hands for a later determination as to whether there was gunshot residue. A criminalist testified that the samples from defendant's hands tested positive for gunshot residue and indicated that defendant either fired a weapon, handled a weapon that had been recently fired, was near a weapon that had been recently fired, or came into contact with a surface that had gunshot residue on it.

7.

**DISCUSSION**

## I. Defendant's attempted premediated murder conviction is supported by sufficient evidence.

### A. Standard of Review and Applicable Law

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57 (*Brooks*).) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) If more than one inference may reasonably be drawn from the evidence, we accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"A 'willful, deliberate, and premeditated killing' is murder in the first degree. (§ 189.) ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' [Citation.] 'The true test is

8.

not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides … which are the result of mere unconsidered or rash impulse hastily executed.' " (*Brooks, supra*, 3 Cal.5th at p. 58.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, our Supreme Court "identified three categories of evidence relevant to deciding whether to sustain a verdict of first degree murder based on premeditation and deliberation: (1) evidence of planning activity prior to the killing, (2) evidence of the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill, and (3) evidence that the manner in which the defendant carried out the killing 'was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'

"The identified categories of evidence are those we ' "typically" find sufficient' to uphold first degree murder convictions. [Citation.] But we have also observed that the *Anderson* factors are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*Brooks, supra*, 3 Cal.5th at pp. 58–59, first bracketed insertion added.)

**B.     Analysis**[3]

The facts and circumstances here provide substantial evidence to support the jury's verdict of first degree murder and willful, premeditated, and deliberate attempted murder.

---

**3**     Although defendant's arguments as to the sufficiency of the evidence are broken into two sections, one as to his intent to kill and the other as to premeditation and deliberation, we shall perform one analysis because premeditation and deliberation encompass intent to kill, and a

The *Anderson* factors support this conclusion. First, defendant arranged a meeting with Brandon and lured him there with the promise of paying money owed to him. Defendant rented a car, although he had access to numerous cars at the tow business and owned a car himself, and then drove to the meeting with a concealed firearm. Defendant greeted Brandon and distracted him with the money defendant brought. Although the lockbox for the firearm was later found under the front seat, defendant had the gun ready on his person as evidenced by his use of it within 10 seconds of greeting Brandon. This is evidence of planning. (See, e.g., *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [the defendant's testimony that he saw the victim's reflection in mirror before turning around and stabbing her was evidence of planning, as it established the defendant had sufficient time to reflect].) Second, the manner in which defendant attempted to kill Brandon—a single shot from close range into the chest within seconds of Brandon's greeting—supports an inference of a deliberate decision to ensure death.[4] (See *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 [manner of killing supported findings of premeditation and deliberation, where defendant "quickly fired three shots at the victim, with a shotgun, from a relatively close range"]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [same, where killings were accomplished through "a close-range shooting without any provocation or evidence of a struggle"].) Finally, the jury reasonably could have found a motive for the attempted murder based upon the earlier fight between the two men. Defendant called Brandon a punk, Brandon dropped to his knees to fight with defendant, defendant threw something at Brandon, and Brandon punched defendant. Immediately after that fight, defendant pretended he wished to reconcile and offered Brandon a ride.

---

finding that the evidence is sufficient as to the former necessarily finds sufficient evidence as to the latter.

[4] "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.)

10.

However, once Brandon was in the car, defendant attempted to take Brandon to defendant's own business where he had several family members and told Brandon that defendant wanted Brandon to feel the pain that defendant felt. Brandon was forced to jump from the car while still in motion to escape defendant. There is no evidence that defendant and Brandon spoke during the three weeks between this fight and when defendant called to arrange the meeting on the day of the shooting. (See *People v. Williams* (2018) 23 Cal.App.5th 396, 410 [the defendant's rage at collapse of his marriage evinced motive for killing his wife].)

In sum, substantial evidence supports the jury's findings that defendant intended to kill Brandon, formed that intent through deliberation and premeditation, and then attempted to kill Brandon.

## II. *The trial court correctly instructed the jury as to premeditation and deliberation pursuant to CALCRIM No. 601.*

### A. Background

During the jury instruction conference, the court indicated that it intended to instruct on premeditation and deliberation with CALCRIM No. 601. Defendant stated that he had no issue with the instruction.

The court instructed the jury that to convict defendant of attempted murder, it must find the People proved beyond a reasonable doubt that defendant took a direct step to kill another person and, when he did so, defendant intended to kill that person (see CALCRIM No. 600). The court also instructed the jury as to premeditation and deliberation using CALCRIM No. 601 as follows:

"The defendant acted willfully if he intended to kill when he acted.

"The defendant deliberated if he carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before completing the act of attempted murder.

11.

"The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated.

"The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.

"A decision to kill ma[de] rationally [*sic*],[5] impulsively, and without careful consideration of the choice and its consequences is not deliberate and premeditated.

"On the other hand, the cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

## B. Standard of Review and Applicable Law

Defendant next contends the trial court prejudicially erred by instructing the jury with the standard jury instruction's definition of "premeditation" as it related to the attempted murder charge. He argues that CALCRIM No. 601 does not correctly define premeditation because "defining premeditation as a decision to kill before completing the acts of attempted murder is tantamount to merely requiring the defendant to have acted with the intent to kill." We reject defendant's argument that CALCRIM No. 601 is flawed.

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) "Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here, the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.] 'In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine

---

[5] CALCRIM No. 601 uses the word "rashly" and not "rationally."

12.

whether the instruction, so understood, states the applicable law correctly.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526, first bracketed insertion added.) " 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.)

### C.    Analysis

CALCRIM No. 601 sufficiently instructed the jury with the correct applicable legal principles governing first degree murder.  According to our Supreme Court, " '[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.' " (*People v. Cage* (2015) 62 Cal.4th 256, 275.)  In addition to willfulness (intent to kill), " ' "[d]eliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' " (*Brooks, supra*, 3 Cal.5th at p. 58; see *People v. Houston, supra*, 54 Cal.4th at p. 1216 [" ' " 'premeditated' means 'considered beforehand.' " ' "]; *People v. Jennings* (2010) 50 Cal.4th 616, 645 [same]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 419 [same].)

Thus, CALCRIM No. 601's language stating that "[t]he defendant acted with premeditation if he decided to kill before completing the act of attempted murder" is consistent with our Supreme Court's definition of premeditation.

Further, CALCRIM No. 601 contains additional language clarifying that a defendant's mere decision to kill, by itself, is not sufficient to establish premeditation. Rather, it explains that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated," and that "[t]he test is the extent of the reflection, not the length of time."  Thus, the instruction expressly provides that an impulsive decision, made without reflection, does not constitute premeditation.  Consequently, rather than remove the element of reflection required for a finding of first degree murder, the instruction specifically requires that the

13.

jury find defendant guilty only if it finds defendant reflected and considered his actions before killing.

The element of reflection is similarly embedded in CALCRIM No. 601's directive that defendant must not only act with premeditation, but also must act willfully (if "he intended to kill") and deliberately (if "he carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill"). The combined requirements of " ' "willful, deliberate, and premeditated" ' " emphasize that the jury must find defendant acted with " 'substantially more reflection than may be involved in the mere formation of a specific intent to kill.' " (*People v. Arias* (2008) 45 Cal.4th 169, 181.) Thus again, for the jury to find defendant guilty, it must first find defendant carefully weighed the consequences of his actions; in other words, it must find defendant first reflected on his decision to kill.

CALCRIM No. 601's language is therefore distinguishable from the jury instruction considered by our Supreme Court in *People v. Bender* (1945) 27 Cal.2d 164, abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110, a case relied on by defendant. The issue in *Bender* was an instructional error indicating a lethal act could be found deliberate and premeditated "even though it be executed in the very moment it is conceived, with absolutely 'no appreciable' time for consideration." (*Bender*, at p. 182.) Our Supreme Court found the instruction erroneous because it "excludes from the required showing any deliberation and premeditation between the intent and the act of killing" because "other portions of the instruction eliminate any necessity for deliberation or premeditation in forming the intent." (*Id*. at p. 183.) Here, as discussed, CALCRIM No. 601 requires findings of deliberation, premeditation, and willfulness. It also embeds the concept of meaningful reflection within those requirements. Thus, taken as a whole, CALCRIM No. 601 comports with the legal

14.

requirements of attempted premeditated murder, and it fairly and fully instructed the jury on the applicable law.

We also note that CALCRIM No. 601 is almost identical to CALCRIM No. 521 (applicable to first degree murder), which provides in part: "The defendant is guilty of first degree murder if the People have proved that [defendant] acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if [defendant] intended to kill. The defendant acted *deliberately* if [defendant] carefully weighed the considerations for and against [defendant's] choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if [defendant] decided to kill before completing the act[s] that caused death." (CALCRIM No. 521.) Defendant's criticism of CALCRIM No. 601's definition of premeditation for attempted murder equally applies to the standard instruction for murder. However, our Supreme Court has accepted CALJIC No. 8.20, the counterpart to CALCRIM No. 521, as a correct statement of the law. (*People v. Millwee* (1998) 18 Cal.4th 96, 135, fn. 13; *People v. Lucero* (1988) 44 Cal.3d 1006, 1021.)[6]

Defendant's focus on CALCRIM No. 601's definition of premeditation, without reading it with the concomitant definition of deliberation, overlooks the fact the crime is one of deliberate and premeditated attempted murder. The requisite mental state consists of both components, not one in isolation. (See *People v. Favor* (2012) 54 Cal.4th 868, 877, quoting *People v. Lee* (2003) 31 Cal.4th 613, 616 ["the premeditation penalty provision of section 664[ subd. ](a) 'must be interpreted to require … the murder

---

[6] CALJIC No. 8.20 provides: "The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand." One premeditates by deliberating before acting. Although CALCRIM No. 521 and CALCRIM No. 601 define "premeditation" as a decision to kill before completing the act that caused death, or the act of attempted murder, we conclude that these phrases convey the same concept as "considered beforehand" in CALJIC No. 8.20.

15.

attempted was willful, deliberate, and premeditated' "].)  When CALCRIM No. 601 is read as a whole, its definitions of deliberation and premeditation properly require the jury to determine the extent of reflection and whether the attempted murder was the result of reflection.  It correctly tells the jury that defendant deliberated if defendant "weighed the considerations for and against [defendant's] choice and, knowing the consequences, decided to kill.…  [And a defendant] acted with *premeditation* if [defendant] decided to kill before completing the act[s] of attempted murder."  (CALCRIM No. 601, fourth bracketed insertion in original.)

Moreover, the jury could not understand the instruction to equate premeditation with merely an intent to kill because CALCRIM No. 601 specifically instructs that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."  Consequently, CALCRIM No. 601 properly focuses the jury on the decisionmaking process, and not simply the defendant's intent to kill.

Here, when the definitions of the terms are read in conjunction, and the instruction is read as a whole, CALCRIM No. 601 adequately instructed the jury on the interdependent meanings of "willfully," "deliberation," and "premeditation."  There was no instructional error.

### III.    *The trial court correctly declined to instruct the jury as to the lesser included offense of voluntary manslaughter.*

#### A.    Background

In considering whether to instruct the jury as to provocation, the court noted that defendant and Brandon had fought three weeks prior to the shooting but there was no evidence of provocation that would cause an average person not to act rationally or with due deliberation.  Defendant advised the court that he did not believe there was evidence that would cause someone to act in the heat of passion.

16.

**B.      Standard of Review and Applicable Law**

Defendant also contends that he was prejudiced by the trial court's failure to sua sponte instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder.  The claim lacks merit, as there was not sufficient evidence to warrant the instruction.

The trial court possesses a duty to instruct on all lesser included offenses " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on other grounds *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)  However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could … conclude[]" ' that the lesser offense, but not the greater, was committed." (*Breverman*, at p. 162, first bracketed insertion added; see *People v. Vargas* (2020) 9 Cal.5th 793, 827 [instruction "is not required when the evidence supporting such an instruction is weak"]; *People v. Westerfield* (2019) 6 Cal.5th 632, 718 [instruction not required when based on speculation].)  Whether or not a reasonable jury could have so concluded based on the evidence in this case is a matter we determine de novo.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

" 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' [Citations.]  'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' ([Citation]; see *People v. Rios* (2000) 23 Cal.4th 450, 461 [certain mitigating circumstances will 'reduce an intentional,

unlawful killing from murder to voluntary manslaughter "by negating the element of malice" ' (italics omitted)].) 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.] '[T]he victim must taunt the defendant or otherwise initiate the provocation.' [Citations.] The ' "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances...." ' [Citation.] ' "[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " (*People v. Avila* (2009) 46 Cal.4th 680, 705, third, fifth, & eighth bracketed insertions in original.)

## C. Analysis

Defendant and Brandon had a fight three weeks prior the shooting, but there is no evidence that they spoke between the fight until when defendant called Brandon to arrange the meeting. Generally, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter. (*People v. Moye* (2009) 47 Cal.4th 537, 550; *People v. Wickersham* (1982) 32 Cal.3d 307, 327, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201.) Three weeks is sufficient time between the provocation and the fatal blow for defendant's passion to subside and reason to return. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1085–1086) [no manslaughter instruction required where provocation arising from argument in shared apartment with victim was not immediately present when the defendant shot victim in security office a short time later following conversation with security monitor]; *People v. Pride* (1992) 3 Cal.4th 195, 250 [criticism the defendant received about his work performance three days before the crimes is insufficient as a matter of law to arouse feelings of homicidal rage or passion in an ordinarily reasonable person].)

Defendant argues that the lapse of three weeks between the fight and the shooting is not determinative of whether sufficient time had passed for defendant's "passion to subside and reason to return to a person of average disposition" because case law supports that there can be a substantial period between the provocative act and the attempted killing. Defendant relies upon *People v. Wright* (2015) 242 Cal.App.4th 1461 and *People v. Berry* (1976) 18 Cal.3d 509 but has misinterpreted the legal principles and circumstances of those two cases. It is true that for purposes of heat of passion voluntary manslaughter, the provocative conduct may comprise numerous incidents over a period of time and not just one incident at the time of the killing. (*Wright*, at p. 1481; *People v. Wharton* (1991) 53 Cal.3d 522, 569.) The provocation need not culminate in an instigative final act that causes a passionate or immediate reaction resulting in the attempted killing, it must be built up by provocation over a period of time proceeding the attempted murder. (*Wright*, at p. 1488.) However, provocation which builds due to provocatory acts occurring over a period of time is decidedly different from this case in which the provocatory act was separated from the attempted murder by a period of time and without any additional provocatory acts in between.

In *Wharton*, our Supreme Court approved a provocation instruction where the defense argued that Wharton killed after he had endured the victim's continuous provocatory conduct for weeks. (*People v. Wharton, supra*, 53 Cal.3d 522, 571.) In *People v. Berry, supra*, 18 Cal.3d 509, the "[d]efendant's testimony chronicle[d] a two-week period of provocatory conduct by his wife … that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Id.* at p. 515.) Similarly, in *People v. Borchers* (1958) 50 Cal.2d 321, the evidence showed a period of "long continued provocatory conduct" (*id.* at p. 329) by a deceased woman that the defendant knew less than five months (*id*. at pp. 323–326). Where provocative conduct continues over a period of time,

a defendant may not have the chance for his passions to cool. Compare these cases to *People v. Bufarale* (1961) 193 Cal.App.2d 551, where "[t]he provocative factor involved was [the deceased]'s rejection of [the] defendant's continued attentions and her decision to live with her husband; this occurred many days previous to the killing and, as a matter of law, did not constitute legal cause for the 'heat of passion' which will reduce an unlawful killing from murder to manslaughter." (*Id*. at p. 562.)

"In sum, where there is no substantial evidence of sufficient provocation that would arouse a passion in an ordinarily reasonable person" *or* where substantial evidence indicates "sufficient time for that passion to subside in a reasonable person, the court need not give a requested instruction on voluntary manslaughter." (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245; see *id.* at pp. 1246–1247 [evidence that two weeks intervened between the defendant's last contact with his grandparents and their deaths combined with lack of evidence as to any provocation within those two weeks insufficient to justify voluntary manslaughter instruction because time elapsed between provocation and the killing was sufficient for passion to subside in a reasonable person].) In this case, the evidence shows that immediately after their fight, defendant attempted to take Brandon somewhere to scare him so that Brandon would feel how defendant had felt. This implies that defendant intended to extract revenge after the fight. Defendant's actions the day of the shooting, in the absence of any additional provocation by Brandon, is evidence that defendant acted out of revenge, an emotion that by law cannot justify an instruction on heat of passion voluntary manslaughter. (*People v. Wright, supra*, 242 Cal.App.4th at p. 1481; see *People v. Souza* (2012) 54 Cal.4th 90, 116–117 [amount of time between assault on mother and son's attack on assailant insufficient to establish " 'rekindled' " provocation and actions were consistent with revenge which cannot establish provocation]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [the defendant

acting out of passion for revenge is not sufficient to establish requisite provocation for voluntary manslaughter].)

We conclude the trial court did not err in refusing defendant's request to instruct the jury on voluntary manslaughter because " 'there was no substantial evidence deserving of consideration which might have led reasonable jurors to reach a verdict of voluntary manslaughter.' " (*People v. Kanawyer, supra*, 113 Cal.App.4th at p. 1248.) The temporal nexus requirement for the provocation or heat of passion instruction was not supported given the lapse of three weeks between the attempt on Brandon's life and the earlier fight and in the absence of any intervening contact or incident.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

LEVY, J.

POOCHIGIAN, J.

21.